# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NEW JERSEY PHYSICIANS UNITED
RECIPROCAL EXCHANGE

        **Plaintiff,**

    **v.**

THE MEDICAL PROTECTIVE
COMPANY, INC., et al.

        **Defendants.**

Civil Action No. 13-2286 (PGS)

MEMORANDUM OPINION

**BONGIOVANNI, Magistrate Judge**

This matter comes before the Court upon The Medical Protective Company, Inc. d/b/a

Princeton Insurance Company's ("Princeton") motion to strike New Jersey Physicians United

Reciprocal Exchange's ("NJPURE") economic expert reports. [Docket Entry No. 134].

NJPURE opposes Princeton's motion. The Court has reviewed all arguments raised in support

of and in opposition to Princeton's motion and considers same without oral argument pursuant to

L.Civ.R. 78.1(b). For the reasons set forth more fully below, Princeton's motion to strike is

GRANTED in part.

## I.      Background and Procedural History

NJPURE is a not-for-profit reciprocal interinsurance exchange which provides medical

malpractice insurance to physicians and other potential policyholders. (Compl. ¶1). Princeton is

a for-profit entity organized for the purpose of engaging in the insurance business, including

medical malpractice insurance. (*Id*. ¶¶ 2, 17; Princeton Answer ¶¶ 2, 17).

On April 10, 2013, NJPURE filed suit against Princeton. Through its Complaint, it claims

that Princeton has and continues to make false or misleading written and oral statements to the

public about NJPURE's business operations and insurance services.[1]  The only false or misleading statements referenced in the Complaint are Princeton's annual "Marketplace Updates," which NJPURE refers to as the "False Comparative Advertisements." (*Id.* ¶ 28). NJPURE alleges that the "Marketplace Updates" offer misleading or false comparisons between its financials and those of its for-profit competitors, such as Princeton. (*Id.* ¶ 30).  Based on Princeton's distribution of the "Marketplace Updates," NJPURE has asserted a claim against Princeton for violations of the Lanham Act, Section 43, 15 U.S.C. § 1125(a) (Unfair Competition) as well as New Jersey common law claims for libel, libel *per se*, trade libel and tortious interference with prospective contractual relationships. (*Id.* ¶¶ 4-6; 72-108).[2]

Prior to filing suit against Princeton, NJPURE filed a Complaint, since twice amended, against Boynton & Boynton, Inc. ("Boynton") and Kevin Byrne ("Byrne") (collectively, the "Boynton Defendants"). (*See* Civil Action No. 12-5610).  Boynton is an insurance agency in the business of selling medical malpractice insurance. (*See* Second Am. Compl. ¶2 in Civil Action No. 12-5610; Answer to Am. Compl. ¶ 2 in Civil Action No. 12-5610).[3]  Byrne is a licensed agent of Boynton. (*See Id.* ¶ 3; Answer to Am. Compl. ¶3 in Civil Action No. 12-5610). Through its Second Amended Complaint, NJPURE claims that Boynton and Byrne have and continue to make false or misleading written and oral statements to the public about NJPURE's business operations and insurance services.  As examples of the Boynton Defendants' false or

---

[1] While NJPURE's Complaint references both written and oral statements (*see, e.g.* Compl. ¶ 68), the only false or misleading statements referenced in the Complaint are Princeton's annual, written "Marketplace Updates" and NJPURE has only asserted various libel claims, no claims for slander, against Princeton.

[2] NJPURE also asserted a claim against Princeton under the Insurance Trade Practices Act; however, NJPURE later stipulated to the dismissal of this claim. (*See* Stipulation and Order of Dismissal of 5/8/2014; Docket Entry No. 56).

[3] Unless otherwise indicated, all Docket Entry No. references come from Civil Action No. 13-2286).

misleading statements, NJPURE relies on email exchanges between Byrne and two specifically identified prospective clients of NJPURE, as well as on "Marketplace Updates" issued by the Boynton Defendants to NJPURE's prospective clients. NJPURE alleges that the "Marketplace Updates" offer misleading or false comparisons between its financials and those of its for-profit competitors served by the Boynton Defendants. (Second Am. Compl. ¶ 24 in Civil Action No. 12-5610). Given the Boynton Defendants' alleged scheme to disseminate libelous and slanderous information about NJPURE to the public via email and other media, NJPURE has asserted claims against Boynton and Byrne for violations of the Lanham Act, Section 43, 15 U.S.C. § 1125(a) (Unfair Competition), as well as New Jersey common law claims for libel, libel *per se*, slander, slander *per se*, trade libel and tortious interference with prospective contractual relationships. (*Id.* ¶¶ 5-7; 92-139).[4]

While NJPURE sought to consolidate the matters it separately filed against Princeton and the Boynton Defendants, the District Court determined that it would not be appropriate, at least at that juncture, to consolidate both cases for trial purposes. In reaching this conclusion, the District Court found:

> [W]hile both cases involve allegations of the "Market Updates," the Boynton Action clearly contains unrelated claims and allegations based on false written and oral statements made by the Boynton Defendants to customers in an effort to s[ell] malpractice insurance policies that are not present in the Princeton Action. These additional factual and legal issues predominate the Boynton Action, and significantly, they are irrelevant to the Princeton Action; as such, it would not be appropriate to try these cases at the same time.

---

[4]NJPURE also asserted claims against Boynton and Byrne under the Insurance Trade Practices Act; however, these claims were dismissed. (*See* Op. and Order of 1/28/2014; Docket Entry Nos. 39 & 40 in Civil Action No. 12-5610).

(Letter Order of 3/23/2015 at 2; Docket Entry No. 72).  Nevertheless, given the overlap between the two cases, "both actions concern allegations of Princeton's false advertisement campaign and how those false publications affected NJPURE[,]" the District Court consolidated the matters for discovery purposes.   (*Id*.)  Since that time, discovery in the two cases has proceeded along the same schedule and the Court's discovery orders have been simultaneously entered in both cases.  Two such orders are primarily relevant to Princeton's pending motion to strike.[5]

First, on October 19, 2015, the Court entered a Letter Order addressing the damages related discovery NJPURE was to produce:

> With respect to Princeton's request for discovery concerning NJPURE's damages, the Court agrees that the time has come for NJPURE to identify, with some specificity, what its damages are. Rule 26(a)(1)(A)(iii) requires a party to provide "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]"   While the precise amount of damages allegedly suffered by NJPURE may be determined at trial, NJPURE is obligated to produce damages related discovery.  As a result, to the extent it has not done so, NJPURE is directed to supplement its Initial Disclosures regarding damages as well as its responses to Princeton's damages related discovery requests, such as RPDs # 31 & 44, and Interrogatory # 13.   NJPURE must complete this supplementation no later than **October 30, 2015**.

(Letter Order of 10/19/2015 at 2; Docket Entry No. 93).

---

[5] Given that the two cases have not been consolidated for trial purposes coupled with the fact that Princeton and the Boynton Defendants raised different issues regarding the Soudry Reports, the Court directed that Princeton and the Boynton Defendants' file separate motions to strike. (Letter Order of 7/11/2016 at 10; Docket Entry No. 133).  The Court addresses the two motions to strike separately, with only Princeton's motion being discussed herein.

Second on December 10, 2015, in response to a dispute raised by Princeton regarding the sufficiency of the damages related discovery produced by NJPURE, the Court entered a Letter Order finding:

> The Court is underwhelmed by NJPURE's response / production regarding damages. It is clear that at this juncture that its claim of damages is speculative. While the Court appreciates that precision with respect to damages may come via expert discovery and that a damages calculation may evolve over time and become fine-tuned by the time of trial, at this instant, to speak colloquially, NJ Pure appears to have nothing. Indeed, NJPURE's supplementation of its Initial Disclosures with respect to damages stated in total:
>
> > Plaintiff has asserted in Counts Four and six of the Second Amended Complaint claims of Libel *per se* and Slander *per se* for which damages are presumed as a matter of law. See d,g, <u>MacKay v. CSK Publ. Co., Inc.</u>, 300 N.J. Super. 599 (App. Div. 1997). Plaintiff seeks all such presumed damages against defendants in this matter.
> >
> > In addition to the foregoing, plaintiff seeks all damages pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.*, including but not limited to plaintiff's lost profits, the profits of defendants attributable to the actionable conduct, and corrective advertising expenses. Plaintiff's investigation into the full scope of damages is ongoing and continuing. To date, plaintiff has identified the following insureds/potential insureds whose business was lost in substantial part due to defendants' wrongful conduct as described in the complaint and discovery exchanged: Dr. Mary Anne Fury; Dr. Babak Behin; Dr. Ghassan Khani; Dr. Marc Levine; Dr. Joshua Wolpert; Dr. Mark Ditmar; Dr. Pavlinka Dundeva-Baleva; Dr. Aravinda Reddy; Dr. Sandra Ann Mead; Dr. Babatunji Omotoso; Dr. Mansoora Chaudry; Dr. Mainish Saini; Dr. Julie Lorber; Dr. Fauzia Hameed; Dr. Patricia Graham; Dr. James Schlesinger; Dr. Eugene Jerome Lind; Dr. Phillip Paparone; Dr. Lisa Simone Vernon, Pulmonary & Allergy Associates, P.A. and University Radiology Group.

> Plaintiff believes that the amount of monetary damages caused by the defendants' wrongful conduct as described in the complaint and discovery to be in excess of $2,000,000. Plaintiff has not yet retained expert witnesses with regard to the exact quantum of damages.

> Plaintiff reserves the right to amend and/or supplement the foregoing responses as discovery continues in this matter.

(Letter from Manuel J. Almeida, Jr. to James M. Nardelli of 10/30/2015).

> NJPURE's cases have been collectively pending for over 2½ years. They need to move. Any information NJPURE seeks to rely upon either directly or through an expert for the purposes of establishing damages that is in NJPURE's possession, custody or control needs to be produced **NOW**. If it is not, and the Court determines that it should have been, then NJPURE shall be precluded from later relying on it to establish its damages claim. In other words, if nothing else is produced/identified, the Court shall presume that NJPURE's current production of facts/documents/information is complete and NJPURE shall be limited to same. While the Court appreciates that depositions can be used to elucidate the parties' positions, they are not a substitute for adequate paper discovery.

> Under these circumstances, the Court finds that the **March 1, 2016** end date for fact discovery remains sufficient. The parties should be able to take the 7 depositions they previously anticipated and had scheduled as well as any additional depositions in that time period. NJPURE shall produce its expert report(s) by **April 15, 2015**. NJPURE is reminded that all facts or data considered by its expert in forming his opinions must be disclosed with its expert report(s). *See* FED.R.CIV.P. 26(a)(2)(B)(ii). If, after reviewing NJPURE's expert report(s), Princeton believes that information considered by the expert was not timely produced, Princeton may seek to preclude the District Court's consideration of all or a portion of the report(s).

(Letter order of 12/10/2015 at 2-4; Docket Entry No. 104).

On April 29, 2015, NJPURE served Princeton with Mr. Michael Soudry's preliminary analysis report, which addressed NJPURE's alleged damages. On May 20, 2016, NJPURE served Princeton with a supplemental report on damages. Upon receipt and review of same, Princeton wrote the Court asking that both Mr. Soudry's preliminary analysis report and supplemental report (collectively, the "Soudry Reports") be stricken because in same, in contravention of the Court's Orders, Mr. Soudry relied on documents and information never produced by NJPURE during discovery. (Letter from Walter J. Fleisher Jr. to Hon. Tonianne J. Bongiovanni of 6/7/2016 at 1-3). After receiving additional informal letter briefing on Princeton's request to strike the Soudry Reports, the Court determined that in light of the significance of the issues raised, "not only in terms of the numbers of issues raised, but also based on the impact a decision regarding those issues could have on NJPURE[,]" the question of whether the Soudry Reports should be stricken "should be the subject of formal motion practice." (Letter Order of 7/11/2016 at 9; Docket Entry No. 133). As a result, Princeton filed the instant motion to strike in accordance with the briefing scheduled outlined in the Court's July 11, 2016 Letter Order. (*Id*. at 10).

## II.     The Parties' Arguments

### A.  Princeton's Arguments

Princeton argues that the Soudry Reports should be stricken under FED.R.CIV.P. ("Rule") 37(b)(2) and 37(c) because they rely on documents and information never produced in discovery. Princeton also notes that the Court has the power to enforce its own Orders and, consequently, could strike the Soudry Reports based on the October 19 and December 10, 2015 Letter Orders.

With respect to the documents and information NJPURE failed to produce, Princeton identifies the following four pieces of information:  (1) an email from NJPURE to a physician

group known as University Radiology Group ("URG") that disclosed a May 18, 2012 rate indication; (2) a December 2010 rate indication NJPURE provided to Dr. Shen as well as a "View Activity History" for Dr. Chen; (3) NJPURE's policy retention rates and group retention rates for 2004-2014; and (4) NJPURE's Annual Statements for 2013-2015. Princeton argues that NJPURE's failure to produce the aforementioned information during discovery warrants the Court striking the Soudry Reports based on the factors outlined in *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81 (D.N.J. 2006); *Ford Motor Co. v. Edgewood properties, Inc.*, No. 06-1278, 2011 WL 5828661 (D.N.J. Nov. 18, 2011); and *Ware v. Rodale Press, Inc.*, 322 F.3d 218 (3d Cir. 2003).

In this regard, Princeton argues that it has been prejudiced by NJPURE's failure to produce the aforementioned discovery, which is clearly material to NJPURE's damages calculation. Specifically, Princeton argues that NJPURE's failure to produce the relevant discovery caused Princeton to waste time and resources determining whether the information had, in fact, been produced, and then, after determining it had not, waste additional time and resources bringing NJPURE's failure to the Court's attention, first informally and then through the instant formal motion to strike. Importantly, Princeton contends that had it timely been given access to the withheld information, it would have sought additional discovery. For example, Princeton claims it would have sought additional discovery regarding the retention rates the Soudry Reports rely upon in determining NJPURE's damages. Princeton argues that it would have sought both paper and Rule 30(b)(6) testimony on the retention rates to determine what the retention rates were, how they factored into NJPURE's business, whether the retention rates used in the Soudry Reports are appropriate to use in analyzing whether NJPURE would have retained the at-issue accounts, etc. Further, Princeton maintains that it could not have sought said

information from the witnesses it deposed after the Soudry Reports were served both because, as this Court recognized, depositions "'are not a substitute for adequate paper discovery'" (Princeton Reply Br. at 8 (quoting Letter Order of 12/10/2015 at 3)), and because when it attempted to do so, NJPURE's Chief Marketing and Business Development Officer and designated Rule 30(b)(6) witness, Eric Poe, testified he was "uncertain how such rates are measured, did not know what these rates were for NJ PURE in any particular year, and did not know if NJ PURE's retention rates had been produced in discovery." (*Id.*)

Further, Princeton argues that discovery cannot be reopened to cure the prejudice caused by NJPURE's failure to produce the damages related discovery relied upon in the Soudry Reports because doing so would substantially disrupt the completion of this litigation. Princeton notes that at the time it filed its motion to strike, this matter had already been pending for 39 months and the Boynton matter for 46 months. Princeton argues that the cases have languished for so long in large part due to NJPURE's discovery deficiencies. Princeton claims that given how this matter has proceeded to date, reopening discovery would likely cause significant further delay and cost significant additional resources. Moreover, Princeton argues that based on the case history it would be inconsistent for the Court to reopen fact discovery now. In this regard, Princeton notes that twice before the Court refused to extend the March 1, 2016 fact discovery deadline. (*See* Letter Orders of 12/10/2015 and 5/4/2016; Docket Entry Nos. 104; 111).

In addition, Princeton claims that the prejudice caused by NJPURE's failure to timely produce damages related discovery as ordered by this Court cannot be cured by a sanction other than striking the Soudry Reports. For example, Princeton claims that a monetary fine is insufficient because such a fine is incapable of replacing its lost opportunity to gain relevant discovery. Further, Princeton argues that based on NJPURE's past history of dilatoriness, there

is no reason to believe that NJPURE would fully comply without delay with future court orders providing for additional damages related discovery.

Princeton also argues that NJPURE's reliance on unproduced information in the Soudry Reports can in no way be characterized as an innocent mistake. In this regard, Princeton argues that NJPURE was certainly on notice that it was obliged to produce damages related information as Rule 26 makes this obligation clear as did the Court's two Letter Orders. In light of same, Princeton contends that the Court should find that NJPURE acted in bad faith.

Moreover, Princeton maintains that NJPURE's history of noncompliance is only its own fault. Indeed, Princeton claims that throughout this entire case, but especially within the past year, NJPURE has acted unreasonably in resisting all efforts by Princeton to move discovery forward. Princeton notes that all of the unproduced documents/information relied upon in the Soudry Reports was in NJPURE's possession before the Court entered the two Orders compelling NJPURE to produce damages related discovery. Princeton further claims that NJPURE still has not amended its discovery responses to include the information disclosed in the Soudry Reports.

Based on the foregoing and the applicable case law, Princeton argues that the Soudry Reports should be stricken. Further, Princeton asks that the Court require NJPURE to pay its attorney's fees and costs incurred pursuing this motion to strike under Rule 37(b).

### B. NJPURE's Arguments

NJPURE opposes Princeton's motion to strike. In doing so, it raises a few main arguments. First, NJPURE argues that Princeton's motion to strike must be denied because the information Princeton claims was not produced does not affect the entirety of the Soudry Reports. Second, NJPURE argues that Princeton has not be prejudiced or surprised by the

inclusion of the allegedly unproduced information. Third, NJPURE argues that monetary sanctions must be denied because NJPURE did not willfully violate the Court's Orders or fail to comply with them in bad faith.

As to the specific documents/information Princeton claims NJPURE failed to produce, NJPURE contends that it produced information regarding URG's rate indication and that Princeton possessed NJPURE's Annual Statements from 2013-2015. Therefore, NJPURE maintains only two areas of discovery are at issue: (1) the policy retention rates and group retention rates for 2004-2014 disclosed in the charts utilized by Mr. Soudry in his expert reports; and (2) the exact premiums for Dr. Shen or the physician group, Pulmonary and Allergy Associates ("PAA"). NJPURE concedes it did not produce these documents during discovery.

Nevertheless, NJPURE maintains that Princeton has not been prejudiced by the nondisclosure. In this regard, NJPURE argues that all of the physicians and medical practices included in the Soudry Reports were identified within the Court's deadline for the production of damages related discovery. In addition, NJPURE claims that these physicians / medial practices are the insureds and/or customers of Defendants, and therefore Defendants know what premiums they pay.[6]

With respect to URG's rate indication, NJPURE argues that while the specific email highlighted by Princeton was not produced, on December 21, 2015, when it supplemented its damages related discovery, it produced emails demonstrating that "a rate indication was provided with respect to URG for a premium between '$1,687,500-$1,820,000[,]" and on January 20, 2016, Franca Hobbs, the representative of URG named in NJPURE's Complaint, produced an

---

[6] Princeton contends that NJPURE knows that this is not true as neither PAA nor Dr. Shen were insureds of Princeton during the time period applicable to this litigation.

email establishing that URG was given a rate indication by Plaintiff of $1,560,000 and testified that "her group was paying . . . $1.6 million" (NJPURE Opp. at 7; Docket Entry No. 135). NJPURE notes that in his expert report, Mr. Soudry used the lowest known premium number to calculate damages related to URG.

Similarly with respect to the undisclosed policy retention rate and group retention rate information disclosed in the charts included in the Soudry reports, NJPURE argues that it did not produce this information because it never expected retention rates to be used in relation to damages. NJPURE argues that Mr. Soudry used this information to generate a conservative damages calculation, which actually benefits (not prejudices) Princeton as the retention rate information was used to reduce NJPURE's damages. Moreover, NJPURE claims that if Princeton believed the retention rate information was significant, it could have questioned three different witnesses, all of whom were deposed after said information was produced in the Soudry Reports - Dr. Lena Chang, Eric Poe or Joana Quaintance – regarding same.

NJPURE also maintains that there is no incurable prejudice to Princeton because Princeton has not yet served its expert reports. As a result, NJPURE maintains that Princeton can confer with its experts regarding the information set forth in the Soudry Reports and its experts can address any issues raised.

For these reasons, based on the relevant precedent, NJPURE argues that the Soudry Reports should not be stricken. NJPURE likewise argues that monetary sanctions are not warranted. In this regard, as already explained, NJPURE claims there has been no prejudice to Princeton. NJPURE also contends that there is no evidence of willfulness or bad faith as it complied with the Court's Orders and produced damages related discovery in accordance with same. In this regard, NJPURE argues that the few documents Princeton did not receive until

NJPURE produced the Soudry Reports were withheld unintentionally either because NJPURE

inadvertently failed to produce the document (*e.g.,* the email regarding URG's rate indication) or

because they did not exist until requested by Mr. Soudry, himself (*i.e.*, the retention rate charts).

Under these circumstances, NJPURE argues that the imposition of attorney's fees and costs is

not warranted and the Court should not in its discretion impose same.

## III.    Analysis

Without awaiting a discovery request, Rule 26(a)(1)(A)(iii) requires each party to provide

to the other parties "a computation of each category of damages claimed by the disclosing party

– who must also make available for inspection and copying as under Rule 34 the documents or

other evidentiary material, unless privileged or protected from disclosure, on which each

computation is based, including materials bearing on the nature and extent of injuries suffered[.]"

Given NJPURE's alleged failure to produce sufficient information regarding its damages, the

Court twice entered Letter Orders addressing NJPURE's obligation to produce damages related

discovery.  First, on October 19, 2015, the Court ruled:

> With respect to Princeton's request for discovery concerning
> NJPURE's damages, the Court agrees that the time has come for
> NJPURE to identify, with some specificity, what its damages are.
> Rule 26(a)(1)(A)(iii) requires a party to provide "a computation of
> each category of damages claimed by the disclosing party – who
> must also make available for inspection and copying as under Rule
> 34 the documents or other evidentiary material, unless privileged or
> protected from disclosure, on which each computation is based,
> including materials bearing on the nature and extent of injuries
> suffered[.]"  While the precise amount of damages allegedly
> suffered by NJPURE may be determined at trial, NJPURE is
> obligated to produce damages related discovery.  As a result, to the
> extent it has not done so, NJPURE is directed to supplement its
> Initial Disclosures regarding damages as well as its responses to
> Princeton's damages related discovery requests, such as RPDs # 31
> & 44, and Interrogatory # 13.   NJPURE must complete this
> supplementation no later than **October 30, 2015**.

(Letter Order of 10/19/2015 at 2). Second, on December 10, 2015, the Court held:

> The Court is underwhelmed by NJPURE's response / production regarding damages. It is clear that at this juncture that its claim of damages is speculative. While the Court appreciates that precision with respect to damages may come via expert discovery and that a damages calculation may evolve over time and become fine-tuned by the time of trial, at this instant, to speak colloquially, NJ Pure appears to have nothing. Indeed, NJPURE's supplementation of its Initial Disclosures with respect to damages stated in total:

>> Plaintiff has asserted in Counts Four and six of the Second Amended Complaint claims of Libel *per se* and Slander *per se* for which damages are presumed as a matter of law. See d.g, <u>MacKay v. CSK Publ. Co., Inc.</u>, 300 N.J. Super. 599 (App. Div. 1997). Plaintiff seeks all such presumed damages against defendants in this matter.

>> In addition to the foregoing, plaintiff seeks all damages pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.*, including but not limited to plaintiff's lost profits, the profits of defendants attributable to the actionable conduct, and corrective advertising expenses. Plaintiff's investigation into the full scope of damages is ongoing and continuing. To date, plaintiff has identified the following insureds/potential insureds whose business was lost in substantial part due to defendants' wrongful conduct as described in the complaint and discovery exchanged: Dr. Mary Anne Fury; Dr. Babak Behin; Dr. Ghassan Khani; Dr. Marc Levine; Dr. Joshua Wolpert; Dr. Mark Ditmar; Dr. Pavlinka Dundeva-Baleva; Dr. Aravinda Reddy; Dr. Sandra Ann Mead; Dr. Babatunji Omotoso; Dr. Mansoora Chaudry; Dr. Mainish Saini; Dr. Julie Lorber; Dr. Fauzia Hameed; Dr. Patricia Graham; Dr. James Schlesinger; Dr. Eugene Jerome Lind; Dr. Phillip Paparone; Dr. Lisa Simone Vernon, Pulmonary & Allergy Associates, P.A. and University Radiology Group.

>> Plaintiff believes that the amount of monetary damages caused by the defendants' wrongful conduct as described in the complaint and discovery to be in excess of $2,000,000. Plaintiff has not yet

> retained expert witnesses with regard to the exact quantum of damages.
>
> Plaintiff reserves the right to amend and/or supplement the foregoing responses as discovery continues in this matter.

(Letter from Manuel J. Almeida, Jr. to James M. Nardelli of 10/30/2015).

> NJPURE's cases have been collectively pending for over 2½ years. They need to move. Any information NJPURE seeks to rely upon either directly or through an expert for the purposes of establishing damages that is in NJPURE's possession, custody or control needs to be produced **NOW**. If it is not, and the Court determines that it should have been, then NJPURE shall be precluded from later relying on it to establish its damages claim. In other words, if nothing else is produced/identified, the Court shall presume that NJPURE's current production of facts/documents/information is complete and NJPURE shall be limited to same. While the Court appreciates that depositions can be used to elucidate the parties' positions, they are not a substitute for adequate paper discovery.
>
> Under these circumstances, the Court finds that the **March 1, 2016** end date for fact discovery remains sufficient. The parties should be able to take the 7 depositions they previously anticipated and had scheduled as well as any additional depositions in that time period. NJPURE shall produce its expert report(s) by **April 15, 2015**. NJPURE is reminded that all facts or data considered by its expert in forming his opinions must be disclosed with its expert report(s). *See* FED.R.CIV.P. 26(a)(2)(B)(ii). If, after reviewing NJPURE's expert report(s), Princeton believes that information considered by the expert was not timely produced, Princeton may seek to preclude the District Court's consideration of all or a portion of the report(s).

(Letter Order of 12/10/2015 at 2-4).

Despite these very explicit Letter Orders, NJPURE failed to produce in discovery all of the information its damages expert relied upon in crafting the Soudry Reports. Instead, as Princeton notes, four pieces of information were included and relied upon in the Soudry Reports that NJPURE did not produce in discovery: (1) an email from NJPURE to URG that disclosed a

May 18, 2012 rate indication; (2) a December 2010 rate indication NJPURE provided to Dr. Shen as well as a "View Activity History" for Dr. Chen; (3) NJPURE's policy retention rates and group retention rates for 2004-2014; and (4) NJPURE's Annual Statements for 2013-2015.[7] The Court, therefore, must determine what, if any, sanction(s) is warranted.

Rule 37 authorizes the Court to impose a wide range of sanctions on a party who has failed to comply with its discovery obligations. In this regard, Rule 37(b)(2)(A) provides:

> If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following: . . . (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]

Further, Rule 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

In deciding whether to impose sanctions under Rule 37(c)(1), the Court considers four factors:

> (1) prejudice or surprise to the Plaintiffs; (2) the ability of Plaintiffs to cure the prejudice; (3) the likelihood of disruption; and (4) the Defendants' bad faith or unwillingness to comply. These

---

[7] While NJPURE argues that its Annual Statements are public documents and that Princeton had copies of same, that alone is insufficient. If NJPURE intended to rely on them, they should have been produced or at least identified in discovery. There is no indication that they were. Indeed, the Court previously ordered Princeton to produce publicly available documents. (*See* Letter Order of 5/18/2016; Docket Entry No. 119).

> factors are nearly identical to the factors this Court considers when
> deciding to exclude evidence under Rule 37(b)(2): (1) the
> prejudice or surprise to Plaintiffs; (2) the ability of Plaintiffs to
> cure that prejudice; (3) the extent to which the evidence would
> disrupt the orderly and efficient trial of the case or other cases in
> the court; and (4) bad faith or willfulness of Defendants in failing
> to comply with the court's order.

*Wachtel.*, 239 F.R.D. at 104-05 (D.N.J. 2006) (citations omitted). Further, where the exclusion

sought under Rule 37(b)(2) "is tantamount to dismissing the claim," such as precluding any

evidence of damages at trial where damages are a necessary element of the claim at issue, the

Court also considers the factors outlined in *Poulis*:

> "(1) the extent of the party's personal responsibility; (2) the
> prejudice to the adversary caused by the failure to meet scheduling
> orders and respond to discovery; (3) a history of dilatoriness; (4)
> whether the conduct of the party or the attorney was willful or in
> bad faith; (5) the effectiveness of sanctions other than dismissal,
> which entails an analysis of alternative sanctions; and (6) the
> meritoriousness of the claim or defense."

*Ware*, 322 F.3d at 221 (quoting *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 868 (3d

Cir. 1984)).

### 1. Prejudice or Surprise to Princeton

The Court finds that Princeton has been prejudiced by NJPURE's reliance on the

unproduced damages related information in the Soudry Reports. In the first instance, Princeton

has been prejudiced by being forced, in fairly short order, to (1) comb the record after the Soudry

Reports were served to determine whether the information relied upon therein was produced by

NJPURE during fact discovery and, after determining that certain information had not been

produced in contravention of two Court Orders, (2) bring this issue to the Court's attention.

There is simply no reason Princeton should have had to have expended the resources to do so

and the Court finds this burden is sufficient to establish prejudice. *See Ware*, 322 F.3d at 222-23

(upholding District Court's determination that party had been prejudiced in part by adversary's failure to timely produce specific information regarding damages, which resulted in party having to file two motions regarding same because prejudice "include[s] the burden that a party must bear when forced to file motions in response to the strategic discovery tactics of an adversary.")

Further, the Court finds that the unproduced information relied upon in the Soudry Reports is significant. For example, NJPURE's damages, most of which are associated with the URG account, are based on unproduced premium and surplus contribution information, which, despite NJPURE's suggestion to the contrary, Princeton was not aware of. Similarly, the unproduced retention rate information relied upon in the Soudry Reports is used to justify NJPURE's claim for damages over multiple years. Princeton should have had the opportunity to take discovery on these pieces of information and it has been prejudiced by the inability to do so in a timely matter. Moreover, the fact that Princeton's experts may be able to address the undisclosed information in their yet unserved expert reports does not cure the prejudice. Because of NJPURE's untimely disclosure, Princeton has been denied the opportunity to arm its own experts with additional information regarding the previously unproduced information, thereby impairing its experts' ability to challenge the assertions contained in the Soudry Reports.

### 2. Ability of Princeton to Cure the Prejudice

Here, the Court finds that Princeton would be unable to cure the prejudice caused by NJPURE's reliance on information not properly disclosed during fact discovery. On multiple occasions, the Court explicitly refused to extend the fact discovery deadline. (*See* Letter Order of 5/4/2016 at 2-4 (determining that good cause did not exist to adjust the fact discovery deadline, noting that "for the past six months, the Court has been vigorously pushing the parties to complete fact discovery" and that "the tenor of [its past] Orders made it clear that the time had

come for all fact discovery, including damages discovery, to be completed"); Letter Order of 12/10/2015 (holding that under the circumstances of the case "the **March 1, 2016** end date for fact discovery remains sufficient" and refusing to extend same.))  It would, therefore, be entirely inconsistent to reopen discovery now.

Moreover, not only would it be inconsistent to do so, but it would also be unfitting.  The Court could not have been any clearer regarding NJPURE's obligations.  As already noted, on October 19, 2015, NJPURE was unambiguously informed that:

> [T]he time has come for NJPURE to identify, with some specificity, what its damages are.  Rule 26(a)(1)(A)(iii) requires a party to provide "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]"  While the precise amount of damages allegedly suffered by NJPURE may be determined at trial, NJPURE is obligated to produce damages related discovery.  As a result, to the extent it has not done so, NJPURE is directed to supplement its Initial Disclosures regarding damages as well as its responses to Princeton's damages related discovery requests, such as RPDs # 31 & 44, and Interrogatory # 13.

(Letter Order of 10/19/2015 at 2).  Similarly, on December 10, 2015, the Court unequivocally stated that NJPURE's damages related discovery was deficient and directed NJPURE to immediately produce said discovery or run the risk of having the information barred later on:

> The Court is underwhelmed by NJPURE's response / production regarding damages.  It is clear that at this juncture that its claim of damages is speculative.  While the Court appreciates that precision with respect to damages may come via expert discovery and that a damages calculation may evolve over time and become fine-tuned by the time of trial, at this instant, to speak colloquially, NJ Pure appears to have nothing.

***

> NJPURE's cases have been collectively pending for over 2½ years. They need to move. Any information NJPURE seeks to rely upon either directly or through an expert for the purposes of establishing damages that is in NJPURE's possession, custody or control needs to be produced **NOW**. If it is not, and the Court determines that it should have been, then NJPURE shall be precluded from later relying on it to establish its damages claim. In other words, if nothing else is produced/identified, the Court shall presume that NJPURE's current production of facts/documents/information is complete and NJPURE shall be limited to same. While the Court appreciates that depositions can be used to elucidate the parties' positions, they are not a substitute for adequate paper discovery.
>
> ***
>
> NJPURE shall produce its expert report(s) by **<u>April 15, 2015</u>**. NJPURE is reminded that all facts or data considered by its expert in forming his opinions must be disclosed with its expert report(s). *See* FED.R.CIV.P. 26(a)(2)(B)(ii). If, after reviewing NJPURE's expert report(s), Princeton believes that information considered by the expert was not timely produced, Princeton may seek to preclude the District Court's consideration of all or a portion of the report(s).

(Letter Order of 12/10/2015 at 2-4). Thus, NJPURE knew it was obliged to produce all information it intended to rely upon to prove damages and was warned that if it attempted to rely on any unproduced information, including through its expert, it would be precluded from doing so. Under these circumstances, the Court finds that it would be inappropriate to reopen fact discovery.[8]

Furthermore, the Court finds that the prejudice is not cured by the fact that Princeton has yet to serve its own expert reports. While Princeton's experts would be able to address Mr.

---

[8] The Court finds that doing so would also be unfair to Princeton. At the time Princeton's motion to strike was filed, this case had already been pending for well over three years. Reopening discovery at this juncture would certainly delay the resolution of this already protracted litigation, and, given how discovery has proceeded to date, the Court suspects that the delay would not be insubstantial.

Soudry's opinions using the information included in his reports, that does not change the fact that Princeton was denied timely access to this information and the ability to obtain discovery on it.

### 3. The Likelihood of Disruption

The Court finds that allowing NJPURE, through the Soudry Reports, to rely on the unproduced documents would disrupt these proceedings. As noted above, Princeton was denied the opportunity to obtain discovery regarding the unproduced documents. It was not, for example, able to explore how the retention rates were measured, how they factored into NJPURE's business, or whether the retention rates used in the Soudry Reports are appropriate to use in analyzing whether NJPURE would have retained the at-issue accounts here.

As also noted there is no way to cure this prejudice because based on the history of the Court's Orders, reopening discovery at this juncture would be inappropriate.[9] The Court's scheduling orders mean something. Indeed, they "'are at the heart of case management'" and integral to the Court's control of its docket. *Estate of Harrison v. Trump Plaza Hotel & Casino*, Civil No. 12-6683 (RBK/KMW), 2015 WL 6951691, at *2 (D.N.J. Nov. 11, 2015) (quoting *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986)). Parties should take comfort from the fact that they can rely upon the deadlines set by the Court. Indeed, it should be the parties' expectations that the deadlines set by the Court are fixed and intended to govern the matter going forward. Otherwise, the entire process would be undermined. *See GlobespanVirata, Inc. v. Texas Instruments, Inc.*, 2015 WL 1638136, at *4 (D.N.J. July 12, 2005) (noting that "'scheduling orders are the heart of the case management [and cannot] be flouted'" as they "'are

---

[9] Moreover, as suggested above, given how this case has been litigated to date, even if the Court found that an extension of discovery was appropriate, which it does not, the Court would also find that said extension would be disruptive to this litigation, likely prolonging the pretrial of this matter (and therefore delaying the trial of this matter) for several months.

designed to offer a degree of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed and the case will proceed.'") (Citations omitted).

Furthermore, it would certainly be disruptive to the just resolution of this action to allow NJPURE to rely on information supporting its damages calculation that Princeton did not have access to before fact discovery closed. *See* Rule 1 (stating that "[t]hese rules . . . should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.")

### 4. NJPURE's Bad Faith or Unwillingness to Comply

Although NJPURE did not initially adequately comply with its obligation to produce damages related discovery, as evidenced by the Court's Letter Orders dated October 19 and December 10, 2015, it is clear that NJPURE did ultimately produce significant information related to its purported damages during the fact discovery period. While the Court generally anticipates a more fulsome production, given the production ultimately made, the Court does not find that NJPURE acted in bad faith or was unreasonably unwilling to comply with the Court's Orders or its obligations under the Federal Rules of Civil Procedure. NJPURE is responsible for failing to produce (1) the email it sent to URG that disclosed a May 18, 2012 rate indication; (2) the December 2010 rate indication it provided to Dr. Shen as well as a "View Activity History" for Dr. Chen; (3) its policy retention rates and group retention rates for 2004-2014; and (4) its Annual Statements for 2013-2015; however, the Court finds that this failure did not result from bad faith or willfulness.

Under these circumstances, the Court finds that striking the Soudry Reports in total is too harsh a sanction to impose. Nevertheless, given the Court's explicit instructions, the Court finds that precluding NJPURE from relying on the undisclosed information is appropriate. As a result,

by **September 15, 2017**, NJPURE is directed to serve a revised economic expert report that does not reference or rely upon (1) the email it sent to URG that disclosed a May 18, 2012 rate indication; (2) the December 2010 rate indication it provided to Dr. Shen as well as a "View Activity History" for Dr. Chen; (3) its policy retention rates and group retention rates for 2004-2014; or (4) its Annual Statements for 2013-2015. Princeton shall serve its expert reports by **October 20, 2017**.

With respect to Princeton's request for a monetary sanction, the Court notes that Rule 37(b)(2)(C) provides, "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Similarly, as already noted herein, Rule 37(c)(1) provides that the Court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure" of a party to provide information required by Rule 26(a). While the imposition of attorney's fees and costs under Rule 37(c)(1) are, therefore discretionary, the imposition is mandated under Rule 37(b)(2)(C) unless the failure to provide discovery pursuant to a court order is "substantially justified or other circumstances make an award of expenses unjust."

Here, the Court finds that the imposition of attorney's fees and costs are not warranted. While the Court finds that NJPURE should have produced the undisclosed information during fact discovery, the Court also finds that NJPURE has in large part provided understandable, if not substantially justified, reasons for its failure. More importantly, the Court specifically requested that the instant motion to strike be filed. Under these circumstances, the Court finds that the imposition of an award of expenses would be unfair.

**IV.     Conclusion**

For the reasons stated above, Princeton's motion to strike is GRANTED in part.  An appropriate Order follows.

Dated:  August 23, 2017

<u>s/ Tonianne J. Bongiovanni</u>
**HONORABLE TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**