DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
(973) 549-7000 (phone)
(973) 360-9831 (fax)
*Attorneys for Defendant*
*Princeton Insurance Company*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY PHYSICIANS UNITED RECIPROCAL EXCHANGE,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>THE MEDICAL PROTECTIVE COMPANY, INC. D/B/A PRINCETON INSURANCE COMPANY; DOES 1–10,<br><br>　　　　　Defendants. | CIVIL ACTION NO. 13-02286-PGS-TJB<br><br>Hon. Peter G. Sheridan, U.S.D.J.<br><br>Motion Day: May 7, 2018 |

**PRINCETON INSURANCE COMPANY'S LOCAL RULE 56.1(a)**
**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Civil Rule 56.1(a), Defendant, Princeton Insurance Company ("Princeton"), submits the following Statement of Material Facts Not in Dispute in support of its Motion for Summary Judgment:

**A.     The Parties and Princeton's Marketplace Updates**

1.     Plaintiff, New Jersey Physicians United Reciprocal Exchange ("NJ PURE"), sells medical malpractice insurance in New Jersey. Verified Complaint (attached as Exhibit 1 to the Declaration of Walter J. Fleischer Jr. Esq. ("Fleischer Decl.")), ¶¶ 1, 14.

2.     Defendant, Princeton, sells medical malpractice insurance in New Jersey. Verified Complaint, ¶¶ 2, 17.

1

3. As a requirement to write medical malpractice insurance policies in New Jersey, both NJ PURE and Princeton submit financial and other information to the New Jersey Department of Banking and Insurance ("DOBI") on an annual basis. In the industry, these filings are known as "Annual Statements." Verified Complaint, ¶¶ 25-27.

4. In the years 2005 – 2012, on an annual basis, Princeton created a publication entitled "Marketplace Update – Prepared for Authorized Agents of Princeton Insurance – [Year]" ("the Princeton Marketplace Updates"). Fleischer Decl. Ex. 2, ¶ 4. Princeton's 2012 Marketplace Update, reflecting information for the year ending December 31, 2011, is attached as Exhibit A to the Verified Complaint. The first pages only of each of Princeton's 2006 – 2012 Marketplace Updates are attached to the Verified Complaint as Exhibit B.

5. Princeton has not published a Marketplace Update since 2012. Fleischer Decl. Ex. 28 at 50:9–11.

6. Each Princeton Marketplace Update contained a chart on the first page that showed certain financial indicators for the named companies (more than just NJ PURE and Princeton) that sold medical malpractice insurance in New Jersey. While some of the insurers and some of the financial indicators changed over time, each Princeton Marketplace Update included NJ PURE and Princeton. Verified Complaint Ex. B.

7. With the exception of the A.M. Best rating category which appeared only in the 2012 Marketplace Update (and which reflects true information concerning NJ PURE and Princeton), the financial indicators that appeared in the Princeton Marketplace Updates were obtained from information in the Annual Statements filed by each company. Verified Complaint Ex. B.

8. The financial indicators on any given Princeton Marketplace Update did not always show that Princeton had the best number, or that NJ PURE had the worst number. For example, for the financial indicator "Loss/LAE Ratio," NJ PURE's number is lower, i.e., better, than Princeton's number in the 2007, 2010, 2011 and 2012 Princeton Marketplace Updates. *See* Verified Complaint Exs. A (as to Loss/LAE Ratio, "usually … the lower the percentage, the better") and B.

9. The Princeton Marketplace Updates also contain, on pages after the first page, narrative information regarding the financial indicators that appear in them. Verified Complaint Ex. A.

10. The Princeton Marketplace Updates were distributed by Princeton to its producers each year. Fleischer Decl. Ex. 2 at ¶ 6.

11. A.M. Best & Company, founded in 1899, is an entity which provides ratings "on the financial stability of insurers and the insurance industry." *About A.M. Best*, A.M. BEST COMPANY, INC., http://www.ambest.com/about/ (last visited February 15, 2018). A.M. Best is considered the foremost authority on rating the financial strength of insurance companies. Fleischer Decl. Ex. 19 at 273:13–274:3. A.M. Best provides ratings ranging from A++ to D. *Financial Strength Rating Guide*, A.M. BEST COMPANY, INC., http://www.ambest.com/ratings/guide.pdf (last visited February 15, 2018).

12. In or around 2004, Princeton lost its A.M. Best rating. Fleischer Decl. Exs. 27 at 37:23–38:13 and 28 at 50:16–51:11.

13. Because it perceived a need to combat rumors in the marketplace about Princeton's financial health, in part caused by the loss of its A.M. Best rating, Princeton decided to create its Marketplace Updates, first published in 2005. Fleischer Decl. Ex. 27 at 37:6–13.

14. Princeton's purpose in distributing its Marketplace Updates was to educate Princeton's producers about certain financial indicators of companies that wrote medical malpractice insurance in New Jersey, including Princeton. Fleischer Decl. Exs. 27 at 41:11–17 (Princeton created its Marketplace Updates "to show how we're doing financially, [and] how were [the competitors] doing.") and 28 at 39:10-17 (prepared to educate Princeton's producers). *See also* Fleischer Decl. Ex. 20 at 641:19–642:8 (responding to Princeton's question, "[w]hat do you know about Princeton's intent in publishing the [Princeton] [M]arketplace [U]pdate[s]…?," Eric Poe of NJ PURE testified that Princeton's "intent was to dispel the fears that they were having regarding the marketplace").

15. Princeton stopped publishing its Marketplace Updates in 2012 (the year before NJ PURE filed the Verified Complaint against Princeton), because, in that year, Princeton's A.M. Best rating was restored at A+ (Superior), thereby making its Marketplace Updates no longer necessary. Fleischer Decl. Ex. 28 at 50:16–51:11.

16. NJ PURE was aware of the Princeton Marketplace Updates each year they were published "within a month or two of whenever they came out." Fleischer Decl. Ex. 21 at 677:23–679:10.

17. NJ PURE never expressed to Princeton any complaint, objection, or criticism concerning the Marketplace Updates prior to NJ PURE filing the instant litigation against Princeton. Fleischer Decl. Ex. 21 at 838:22–839-11.

18. NJ PURE has not identified any advertising, or communications to its insureds or physicians generally in New Jersey, that referenced the Princeton Marketplace Updates. Fleischer Decl. ¶ 34.

19. In December 2010, NJ PURE wrote a letter to DOBI's commissioner complaining about the Princeton Marketplace Updates. NJ PURE in this letter asked DOBI stop Princeton from publishing its Marketplace Updates. NJ PURE did not send a copy of this letter to Princeton. Fleischer Decl. Exs. 4 and 22 at 198:21–25.

20. Princeton published two more Princeton Marketplace Updates (2011 and 2012) after NJ PURE's December 2010 letter. Verified Complaint Ex. B.

21. DOBI took no action to stop Princeton from publishing its Marketplace Updates. *See* Fleischer Decl. Ex. 22 at 200:17–22.

22. In February 2011, DOBI issued Bulletin 11-01, addressed to "all authorized or admitted property and casualty insurers," among other recipients. Fleischer Decl. Ex. 5.

23. The Bulletin stated, in pertinent part, that "if an advertisement includes financial information of competitors, such as surplus, assets or premium, the same information must be presented for the advertising insurer." *Id.*

24. DOBI's February 2011 Bulletin contains no reference to Princeton or its Marketplace Updates. Fleischer Decl. Exs. 5 and 19 at 320:11–22.

25. Every Princeton Marketplace Update included financial indicators of medical malpractice insurers in New Jersey including, among other things, surplus, assets and premium information, and every Princeton Marketplace Update also presented that same financial indicator for Princeton for the same year. *See* Verified Complaint Ex. B.

26. NJ PURE has admitted that "virtually every sentence" contained in the Princeton Marketplace Updates "probably could be construed as true." Fleischer Decl. Exs. 21 at 716:12–717:3 and 22 at 197:5–13 (the Princeton Marketplace Updates contain "true numbers").

27. On or about November 13, 2009, DOBI instituted an Order to Show Cause against NJ PURE for asserted violations of the New Jersey Insurance Trade Practice Act. Fleischer Decl. Ex. 18.

**B. NJ PURE's Allegations against Producers of Medical Malpractice Insurance**

28. On September 7, 2012, NJ PURE filed a Complaint against Boynton & Boynton, Inc. ("Boynton") and Kevin Byrne ("Byrne") ("the *Boynton* Action" and the defendants there collectively "the Boynton Defendants"). Dkt. No. 12-5610, Doc. No. 1.

29. Boynton is a producer of medical malpractice insurance in New Jersey and Byrne was one of Boynton's employees during the time period relevant to this litigation. Fleischer Decl. Ex. 31 at 19:6–8.

30. NJ PURE does not use producers, such as Boynton, to sell their medical malpractice insurance products. *About Us*, NJPURE.com, http://njpure.com/about.aspx (last visited February 15, 2018).

31. NJ PURE's Second Amended Complaint in the *Boynton* Action, filed on May 17, 2013, alleges that the Boynton Defendants made "false written and oral statements to the public" concerning NJ PURE's financials. Fleischer Decl. Ex. 6, ¶¶ 18, 25–39. NJ PURE also alleges that the Boynton Defendants distributed the Princeton Marketplace Updates, as well as different "marketplace updates" that were created and published by Boynton. *Id.* at ¶¶ 40–91.

32. On December 3, 2012, NJ PURE filed a Declaration of Eric S. Poe, Esq. in the *Boynton* Action. Poe was NJ PURE's Chief Marketing and Business Development Officer at that time. Fleischer Decl. Ex. 7.

33. In his December 3, 2012 declaration, Mr. Poe asserted that a physicians group known as University Radiology Group ("URG") had allegedly "expressed an interest in purchasing medical malpractice insurance from NJ PURE" in 2012. *Id.* ¶ 3.

34. Mr. Poe also declared in this declaration that Franca Hobbs, general counsel for URG, expressed "allegations" regarding "NJ PURE's A.M. Best[] rating and NJ PURE's reinsurer" and that these concerns were "identical" to statements contained in emails sent by Byrne to another physician's group. *Id.* ¶ 4–5.

35. Mr. Poe further declared that "as a result of these false allegations … [URG] chose not to continue pursuing purchasing a policy from NJ PURE." *Id.* ¶ 6.

36. On May 16, 2013, attorneys for NJ PURE sent cease and desist letters to five different producers of medical malpractice insurance in New Jersey: (1) The NIA Group; (2) PriMed Consulting; (3) Bollinger Insurance Solutions; (4) MBS Insurances Services, Inc.; and (5) Cornerstone Professional Liability Consultants. Fleischer Decl. Ex. 8.

37. Each of these letters states that "[i]t has been brought to our attention that several agents and brokers have resorted to unfair trade practices by making derogatory remarks regarding NJ PURE" and that "such statements were a direct violation of N.J.S.A. § 17:29B-4." *Id.*

38. The letters also referred the various producers to NJ PURE's "pending Federal Complaint" against Boynton. *Id.*

39. NJ PURE sent the aforementioned letters to these various producers "to curve [sic: should read "curb"] the damages that were being done in the marketplace" by the producers. Fleischer Decl. Ex. 20 at 546:12–547:16.

40. NJ PURE was concerned that producers generally were "badmouthing" NJ PURE in the marketplace. Fleischer Decl. Ex. 24 at 560:5–19.

**C.      NJ PURE's Allegations Against Princeton Insurance Company**

41.     On April 10, 2013, NJ PURE filed a Verified Complaint against Princeton, which alleged that the Princeton Marketplace Updates contained false and misleading statements concerning NJ PURE.  NJ PURE also sought a permanent injunction to prevent Princeton from publishing its Marketplace Updates.  Dkt. No. 13-2286, Doc. No. 3.

42.     Princeton was incorrectly denominated in the caption of the Verified Complaint as "The Medical Protective Company, Inc. d/b/a Princeton Insurance Company."  Fleischer Decl. Ex. 2, ¶ 1.  In 2012, Medical Liability Mutual Insurance Company, Princeton's parent corporation since 2000, sold Princeton to Medical Protective Corporation ("Med Pro"), and Princeton has been a wholly-owned subsidiary of Med Pro since that time.  Fleischer Decl. Ex. 28 at 19:5–21:6.

43.     Except for the incorrect reference to Med Pro in the caption, and in the opening "comes now" paragraph of that pleading, there is no other reference to and there are no allegations against Med Pro in the Verified Complaint.  *See generally* Verified Complaint.

44.     NJ PURE alleged that, as a result of the Princeton Marketplace Updates, it suffered "pecuniary harm in the form of loss of former medical malpractice liability policyholders, delays in obtaining new medical malpractice liability policyholders and the loss of prospective contracts with potential medical malpractice liability policyholders."  Verified Complaint ¶¶ 70–71.

45.     The Verified Complaint has not been amended and is NJ PURE's operative pleading against Princeton today.  *See generally* Dkt. No. 13-2286.

46.     After holding oral argument on April 19, 2013, this Court denied NJ PURE's request for injunctive relief.  Dkt. No. 13-2286, Doc. No. 6.

47.     NJ PURE subsequently filed a motion for reconsideration of the denial of its motion for injunctive relief, which was also denied.  Dkt. No. 13-2286, Doc. No. 50.

48. As has been confirmed by this Court on multiple occasions, NJ PURE's allegations against Princeton are based exclusively on the Princeton Marketplace Updates. Judge Wolfson, in her March 23, 2015 Letter Order denying NJ PURE's motion to consolidate the *Boynton* Action and the *Princeton* Action, said that "in the Princeton Action, NJ PURE seeks redress for alleged harms caused by [Princeton's publication of its Marketplace Updates]" and that NJ PURE's common law claims against Boynton "relating to false and/or misleading oral representations regarding NJ PURE's financial condition … are not part of the Princeton Action." Dkt. No. 13-2286, Doc. No. 72, p. 2. Judge Bongiovanni, in a June 16, 2014 Letter Order, said that "there are no allegations in the Verified Complaint that identify any alleged marketing or advertising … upon which any claim is allegedly based, except for the [Princeton] Marketplace Updates." Dkt. No. 13-2286, Doc. No. 58, p. 14.

49. The Verified Complaint does not contain any allegations that Princeton is responsible for anything said or done by the Boynton Defendants. *See generally* Verified Complaint.

**D.  NJ PURE's Allegations of Lost Business**

50. NJ PURE has not conducted any surveys of physicians to determine whether the Princeton Marketplace Updates were misleading to actual or prospective purchasers of medical malpractice insurance. Fleischer Decl. Ex. 9.

51. NJ PURE has never conducted any survey or study or analysis of how doctors in New Jersey perceive NJ PURE, nor sent them any questionnaire asking what they think about NJ PURE. Fleischer Decl. Ex. 21 at 753:25–755:3.

52. Michael Soudry is NJ PURE's damages expert. In April 2016, he issued a report, which he referred to as a "preliminary analysis." In May 2016, he issued a second report, which

9

he referred to as an "analysis." In August 2017, Judge Bongiovanni held that NJ PURE could not use certain information contained in Mr. Soudry's prior reports, and ordered NJ PURE to serve a revised economic report. Dkt. No. 13-2286, Doc. No. 137, pp. 7, 22–23.

53. On September 15, 2017, NJ PURE served its revised economic report, a third report of Mr. Soudry, which calculated alleged economic losses as a result of the conduct of both Princeton and the Boynton Defendants (the "Soudry Report"). Fleischer Decl. Ex. 10.

54. The Soudry Report does not state that any particular economic loss claimed by NJ PURE was due solely to Princeton's Marketplace Updates. To the contrary, Mr. Soudry calculates damages allegedly caused by a combination of factors, including the different marketplace updates that were created and published by Boynton and emails allegedly sent by the Boynton Defendants. Fleischer Decl. Ex. 10, p. 3.

55. In the Soudry Report, NJ PURE identifies only two medical practices that were potential insureds who allegedly did not purchase insurance from NJ PURE because of the conduct of Princeton and the Boynton Defendants. *Id.*

56. The two medical practices that the Soudry Report identifies as allegedly lost as a result of the conduct of Princeton and the Boynton Defendants are URG and Pulmonary and Allergy Associates ("PAA"). Fleischer Decl. Ex. 10, p. 3.

57. The Soudry Report's economic loss analysis expressly assumes the claim by NJ PURE that the conduct of the Boynton Defendants and Princeton caused URG and PAA not to join NJ PURE. *Id.* (calculating the alleged economic loss "*assuming* that but for the defendants' misleading and/or false comparative advertisements and emails, the two medical practices would have become members of NJ PURE.") (emphasis added).

58. The Soudry Report does not include any survey evidence. *See generally* Fleischer Decl. Ex. 10.

E. **The Record Contains No Evidence that URG, PAA or Any Other Potential Insured Did Not Purchase Insurance from NJ PURE Because of a Princeton Marketplace Update**

**(a) NJ PURE Cannot Identify a Single Insured that Did Not Purchase Insurance from NJ PURE Because of a Princeton Marketplace Update**

59. Four NJ PURE representatives were deposed in this matter: Eric Poe, Dr. Lena Chang, Michael Kochnover and Joanna Quaintance (formerly Joanna Elias). *See generally* Fleischer Decl. Exs. 19–26.

60. On January 29, 2016, Princeton served the operative Notice of Deposition of NJ PURE pursuant to Federal Rule of Civil Procedure 30(b)(6). Fleischer Decl. Ex. 11.

61. Topic number 11 in Princeton's Rule 30(b)(6) Notice was "the identification of all physicians whom NJ PURE claims left NJ PURE or did not purchase insurance from NJ PURE because of any allegedly false and/or misleading statements contained in a Marketplace Update." *Id.*

62. In response to Princeton's Rule 30(b)(6) Notice, NJ PURE designated Eric Poe as its Rule 30(b)(6) witness as to all topics. *See* Fleischer Decl. Ex. 12. Mr. Poe's deposition was taken on March 29, March 30, May 18 and August 2, 2016.

63. Mr. Poe, NJ PURE's Chief Operating Officer, who previously held the title of NJ PURE's Chief Marketing and Business Development Officer, and who has been with NJ PURE since its inception, could not identify a single potential insured that did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. Fleischer Dec. Ex. 19 at 19:21–25; 69:23–70:9 (the names of any such physicians "would be beyond me being able to recall"); 83:20–84:3 (same).

64. Dr. Lena Chang, NJ PURE's co-founder and CEO and the individual who signed the Verified Complaint, was deposed on March 23, April 27 and June 3, 2016.

65. Dr. Chang could not identify a single potential insured that did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. Fleischer Decl. Ex. 23 at 281:16–283:5.

66. Michael Kochnover, NJ PURE's former Director of Marketing and Business Development, who was previously responsible for "head[ing] up [NJ PURE's] sales team," was deposed on February 11, 2016. Fleischer Decl. Ex. 25 at 11:20–22.

67. Mr. Kochnover could not identify a single potential insured that did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. *Id.* at 51:17–55:1 ("I don't recall any names.").

68. Mr. Kochnover was also not aware of any documents that would contain such information. *Id.* (failing to identify any notes).

69. Joanna Quaintance, NJ PURE's former Assistant Director of Marketing and New Business Development, whose job it was to create business for NJ PURE, was deposed on June 16, 2016. Fleischer Decl. Ex. 26 at 16:5–17:1.

70. Ms. Quaintance could not identify a single potential insured that did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. *Id.* at 43:5–9.

71. NJ PURE used SalesForce, a database for managing sales or potential sales, in which sales representatives input notes or information about potential insureds. *Id.* at 54:20–56:8.

72. Ms. Quaintance could not identify any SalesForce notes or other documents that indicated that any physician did not purchase insurance from NJ PURE because of concerns about its financial health. *Id.* at 66:24–67:4.

**(b) Both URG and PAA, the Only Two Physician Groups that NJ PURE Claims as Lost Business, Did Not Review the Princeton Marketplace Updates and Each Provided Other Reasons Why They Did Not Join NJ PURE**

**(i)     URG**

73.    Franca Hobbs, Esq., URG's general counsel, was deposed on January 20, 2016. *See generally* Fleischer Decl. Ex. 29.

74.    Ms. Hobbs's job responsibilities included evaluating medical malpractice insurers and making recommendations to URG's senior management team regarding medical malpractice purchasing decisions. *Id.* at 12:16–13:18.

75.    Ms. Hobbs was the individual who was solicited by NJ PURE and met with Mr. Poe, Mr. Kochnover and Ms. Quaintance of NJ PURE in the spring of 2012. *Id.* at 21:10–22:14.

76.    Ms. Hobbs did not recall ever reviewing a Princeton Marketplace Update. *Id.* at 69:13–15.

77.    There is no evidence that anyone at URG ever read a Princeton Marketplace Update. At his deposition, in response to the question "Do you know whether Franca Hobbs ever read a Princeton Marketplace Update?" Eric Poe testified "I am not Franca Hobbs, so I cannot know whether or not she read it. Even if she glanced at the Marketplace Update, I don't know if she reads. So she could sit in front of a Marketplace Update and I still couldn't attest to what Franca Hobbs read or did not read." Fleischer Decl. Ex. 19 at 78:25–79. *See also* Fleischer Decl. Ex. 20 at 574:5–8 (did not know if Ms. Hobbs ever received a Princeton Marketplace Update).

78.    Ms. Hobbs never told NJ PURE that URG did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. Fleischer Decl. Ex. 19 at 77:21–78:7 ("So did she say … I am not comfortable because of the information [contained] in the marketplace update? No she did not say that.").

79. During that meeting, Ms. Hobbs did not have a Princeton Marketplace Update, nor were the Princeton Marketplace Updates discussed. Fleischer Decl. Ex. 25 at 125:4–126:7.

80. Ms. Quaintance is not aware of any facts to support the contention that URG did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. Fleischer Decl. Ex. 26 at 190:18–23.

81. According to Ms. Hobbs, URG was required to obtain medical malpractice from an A.M. Best-rated carrier. Fleischer Decl. Ex. 29 at 62:15–22.

82. On April 12, 2012, Ms. Hobbs emailed Eric Poe, requesting documentation "as to NJ PURE's rating and by whom it is rated." Fleischer Decl. Ex. 14.

83. On April 25, 2012, Eric Poe emailed Ms. Hobbs and stated, in pertinent part, that he was supplying her with "the official A.M. Best Capital Adequacy Ratio (BCAR) score and report for NJ PURE." Mr. Poe also stated in this email "that NJ PURE's 183.6 BCAR score qualifies us for an A++ (Superior) rating." Fleischer Decl. Ex. 15.

84. NJ PURE was not rated by A.M. Best in 2012. Fleischer Decl. Exs. 9, 16.

85. At the time he sent his April 25, 2012 email to Ms. Hobbs, Mr. Poe knew that if NJ PURE applied for an A.M. Best rating, it would not receive an "A" rating. Fleischer Decl. Ex. 26 at 134:9–16.

86. On May 25, 2012, NJ PURE received a cease and desist letter from an attorney representing A.M. Best regarding Mr. Poe's representations in his April 25, 2012 email to Hobbs. Fleischer Decl. Ex. 16.

87. Once Ms. Hobbs learned from A.M. Best that NJ PURE (specifically Eric Poe) had made a misrepresentation to her regarding its claimed A.M. Best rating, NJ PURE was eliminated from consideration. Fleischer Decl. Ex. 29 at 43:19–44:19 ("Once I was advised by the person at

14

A.M. Best that something had been misrepresented to me, that was it.  I was done because I do not deal with people who are not one hundred percent forthright and honest, and I would never put my company in that situation, so this whole conversation about financials, it didn't matter because we never got to that."); 49:24–50:3 ("I didn't trust anything that was coming out of [NJ] PURE").

88. NJ PURE's sales notes for URG state that Ms. Hobbs was not interested in URG switching from its current medical malpractice carrier.  These sales notes do not say or suggest that a Princeton Marketplace Update influenced URG's purchasing decision.  Fleischer Decl. Exs. 13 and 26 at 126:18–25.

      **(ii)**     **PAA**

89. Larry Epstein, the former CEO of PAA, and the individual solicited by NJ PURE, was deposed on December 22, 2015.  Fleischer Decl. Ex. 30 at 10:25–11:3; 26:14-17.

90. At the time that he was solicited by Mr. Kochnover and Ms. Quaintance of NJ PURE, Mr. Epstein was the person primarily responsible for obtaining information for PAA concerning medical malpractice carriers.  *Id.* at 27:14–19.

91. PAA stayed with its current insurer (MD Advantage) because PAA would lose a capital contribution of at least $150,000 that it made to MD Advantage if it switched insurance carriers.  *Id.* at 17:14–18:11; *see also* Fleischer Decl. Exs. 17 and 25 at 122:22–123:5 (acknowledging Epstein's concern regarding PAA's capital contribution).

92. NJ PURE's sales notes for PAA, written by Ms. Quaintance, state that the rates NJ PURE offered were matched by MD Advantage, and that PAA's capital contribution to MD Advantage was "the determining factor" in PAA remaining a MD Advantage insured.  Fleischer Decl. Ex. 17.  These notes were corroborated by the testimony of both Mr. Kochnover and Ms.

Quaintance. Fleischer Decl. Exs. 25 at 122:22–123:5, and 26 at 192:23–196:2 (acknowledging accuracy of NJ PURE's sales notes regarding PAA's capital contribution).

93. Mr. Epstein did not recall ever reviewing a Princeton Marketplace Update. Fleischer Decl. Ex. 30 at. 33:17–34:18.

94. There is no evidence that anyone at PAA ever read a Princeton Marketplace Update. Both Mr. Kochnover and Ms. Quaintance are not aware of any facts to support the contention that PAA did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. Fleischer Decl. Exs. 25 at 123:6–10 (with regards to PAA, no one ever said "I'm not joining you because of the Princeton marketplace update") and 26 at 191:11–15.

Dated: February 16, 2018

Respectfully,

*[signature]*

Walter J. Fleischer Jr., Esq.
Diego J. Rosado, Esq.
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Phone: (973) 549-7000
*Attorneys for Defendant*
*Princeton Insurance Company*

911511110.5