# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NEW JERSEY PHYSICIANS UNITED
RECIPROCAL EXCHANGE,

        Plaintiff,

v.

THE MEDICAL PROTECTIVE COMPANY,
INC. D/B/A PRINCETON INSURANCE
COMPANY; DOES 1–10,

        Defendants.

CIVIL ACTION NO. 13-02286-PGS-TJB

Hon. Peter G. Sheridan, U.S.D.J.

Motion Day: May 7, 2018

## BRIEF IN SUPPORT OF PRINCETON INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, New Jersey 07932
(973) 549-7000
*Attorneys for Defendant*
*Princeton Insurance Company*

On the Brief:
    Walter J. Fleischer, Jr.
    Diego J. Rosado

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ......................................................................... 1

FACTS AND PROCEDURAL HISTORY ......................................................... 2

    A.    The Parties and Princeton's Marketplace Updates ................................. 2

    B.    NJ PURE's Lawsuit Against Boynton & Boynton and Allegations of Wrongdoing Against Other Producers in the Marketplace ................................... 6

    C.    NJ PURE Asserts the Marketplace Updates Are False and Misleading and Files a Lawsuit against Princeton ................................................... 7

    D.    Judge Wolfson Denies NJ PURE's Motion to Consolidate the Matters for Trial ........................................................................................... 8

    E.    NJ PURE's Allegations of Lost Business ............................................. 9

    F.    The Record Contains No Evidence that URG, PAA or Any Other Potential Insured Did Not Purchase Insurance from NJ PURE Because of a Princeton Marketplace Update ........................................................... 10

        (a) NJ PURE Cannot Identify a Single Insured that Did Not Purchase Insurance from NJ PURE Because of a Princeton Marketplace Update ..................................................................................... 10

        (b) There is No Evidence that URG or PAA, the Only Two Physician Groups that NJ PURE Claims as Lost Business, Ever Read a Princeton Marketplace Update and Each Provided Other Reasons Why They Did Not Join NJ PURE ......................................... 12

    G.    This Court Authorizes the Filing of Summary Judgment Motions against NJ PURE ..................................................................................... 15

GOVERNING LAW ....................................................................................... 16

ARGUMENT ................................................................................................. 16

    I.    NJ PURE MUST PROVE THAT ITS DAMAGES WERE CAUSED BY A PRINCETON MARKETPLACE UPDATE ................................... 17

        A.    Governing Law ................................................................... 17

        B.    The Record is Entirely Devoid of Any Evidence of Causation Sufficient to Create a Genuine Issue of Material Fact ............................ 20

    II.    EVEN ASSUMING NJ PURE DID SUFFER SOME ECONOMIC HARM DUE TO NEGATIVE PERCEPTIONS OF ITS FINANCIAL CONDITIONS IN THE MARKETPLACE, WHICH IT DID NOT, NJ PURE DOES NOT EVEN ALLEGE THAT SUCH ECONOMIC HARM IS ATTRIBUTABLE SOLELY TO THE PRINCETON MARKETPLACE UPDATES ......................................................... 25

i

## TABLE OF CONTENTS
(continued)

**Page**

III.    NJ PURE CANNOT SUSTAIN A CLAIM FOR COMMON LAW LIBEL OR LIBEL *PER SE* .............................................................................. 26

IV.    AS A MATTER OF  LAW, THE PRINCETON MARKETPLACE UPDATES DO NOT CONSTITUTE LIBEL PER SE ........................................ 28

CONCLUSION .......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Black Horse Pike Regional Bd. of Educ.*,
  84 F.3d 1471 (3d Cir. 1996).................................................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................16

*Borough of Fort Lee v. Banque National de Paris*,
  311 N.J. Super. 280 (App. Div. 1998) ................................................25

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) ........................................18, 19, 26

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...........................................................................16

*Chao v. Rothermel*,
  327 F.3d 223 (3d Cir 2003).................................................................19

*Ciba-Geiby Corp. v. Bolar Pharm. Co., Inc.*,
  747 F.2d 844 (3d Cir. 1984)...............................................................19

*Dairy Stores, Inc. v. Sentinel Pub. Co., Inc.*,
  104 N.J. 125 (1986) ...............................................................26, 27, 28

*Enriquez v. West Jersey Health Sys.*,
  342 N.J. Super. 501 (App. Div. 2001) ................................................19

*Gillon v. Bernstein*,
  218 F. Supp. 3d 285 (D.N.J. 2016) ..........................................27, 28, 29, 30

*Lawrence v. Bauer Publ'g. & Printing, Ltd.*,
  89 N.J. 451 (1982) .......................................................................28, 30

*Lexmark International Inc. v. Static Control Components, Inc.*,
  ___ U.S. ___, 1324 S. Ct. 1377 (2014)...........................................18, 26

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993)..................................................................19

*MacDougall v. Weichert*,
  144 N.J. 380 (1996) ......................................................................19, 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)............................................................................16

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Mayflower Transit, LLC v. Prince*,
    314 F. Supp. 2d 362 (D.N.J. 2004) ........................................................................19

*McLaughlin v. Rosanio, Bailets & Talamo, Inc.*,
    331 N.J. Super. 303 (App. Div. 2000) ...........................................................19, 28

*Mun. Rev. Serv., Inc. v. Xspand, Inc.*,
    700 F. Supp. 2d 692 (M.D. Pa. 2010) .................................................................18

*Parkway Baking Co. v. Friehofer Baking Co.*,
    255 F. 2d 641 (3d Cir. 1958)...............................................................................18

*Patel v. Soriano*,
    369 N.J. Super. 192 (App. Div. 2004) ......................................................19, 27, 28

*Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*,
    249 F. Supp. 2d 463 (M.D. Pa. 2003), *modified on other grounds*, 401 F.3d
    123 (3d Cir. 2005)...............................................................................................24

*Synygy, Inc. v. Scott-Levin, Inc.*,
    51 F. Supp. 2d 570 (E.D. Pa. 1999), *aff'd sub nom Synygy, Inc. v. Scott-Levin*,
    229 F.3d 1139 (3d Cir. 2000)...............................................................................23

*System Council T-3 of Intern. Broth. of Elec. Workers v. American Tel. & Tel.
    Co.*,
    905 F. Supp. 198 (D.N.J. 1995) *aff'd*, 91 F.3d 125 (3d Cir. 1996)........................16

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
    898 F.2d 914 (3d Cir. 1990)................................................................................18

*Vospugh v. Kierce*,
    437 N.J. Super. 218 (App. Div. 2014) .................................................................19

*Ward v. Selikovsky*,
    136 N.J. 516 (1994) ............................................................................................28

**Statutes and Rules**

N.J.S.A. § 17:29B-4 ......................................................................................................7, 29

Fed. R. Civ. P. 56 ..........................................................................................................16

## PRELIMINARY STATEMENT

Defendant, Princeton Insurance Company ("Princeton"), hereby submits this brief in support of its Motion for Summary Judgment to dismiss with prejudice the Verified Complaint of the Plaintiff, New Jersey Physicians United Reciprocal Exchange ("NJ PURE").  Because NJ PURE cannot show that Princeton's alleged wrongful conduct caused it harm, the Verified Complaint must be dismissed.

NJ PURE and Princeton both sell medical malpractice insurance in New Jersey.  NJ PURE claims that a document which Princeton published on an annual basis from 2005 through 2012, which included publicly available financial information about NJ PURE, Princeton and other malpractice insurers, contained false and misleading statements about NJ PURE.  In discovery, NJ PURE alleges that, because of these documents, called the Princeton Marketplace Updates, it was damaged because it did not obtain the business of two medical practices.

The Verified Complaint against Princeton, filed in May 2013, was not, however, the first time NJ PURE sued a competitor alleging these same damages.  In September 2012, NJ PURE sued an insurance producer, Boynton & Boynton, Inc. ("Boynton"), and its employee, Kevin Byrne ("Byrne"), in a similar, yet strikingly different, pleading, and this action remains pending.  There, and in two amended pleadings, NJ PURE claims that Boynton and Byrne, both orally and in writing, made false and misleading claims against it.  These alleged misrepresentations included Boynton's own different "marketplace updates," as well as emails and oral communications.

Importantly, all of NJ PURE's causes of action in the Princeton Action require it to show that the Princeton Marketplace Updates caused the economic damages which NJ PURE claims.  As demonstrated below, however, the record, after nearly five years of discovery, is entirely devoid

1

of *any* evidence demonstrating the requisite nexus between the Princeton Marketplace Updates (let alone something false or misleading allegedly found in them) and the damages NJ PURE claims.

To the contrary, the uncontroverted evidence, including the testimony from four representatives of NJ PURE and representatives from the two medical practices at issue, as well as various documents, establishes that there are no facts to suggest either practice ever even read a Princeton Marketplace Update, let alone relied upon something allegedly false or misleading in connection with a purchasing decision.  Because there is no evidence of causation, the Verified Complaint must be dismissed with prejudice.

Additionally, in the unlikely event Princeton's arguments as to causation (Points I & II) do not fully dispose of NJ PURE's claims, NJ PURE's libel and libel *per se* claims are fundamentally flawed (Points III & IV), providing an additional, independent basis for dismissal of those claims against Princeton.  Because the Princeton Marketplace Updates do not impute fraud, deceit, dishonesty or reprehensible conduct to NJ PURE, its libel claims cannot stand.  Additionally, because the Princeton Marketplace Updates are plainly subject to a non-defamatory interpretation, NJ PURE's libel *per se* claim also fails.

For all of these reasons, the Verified Complaint must be dismissed, with prejudice.

## FACTS AND PROCEDURAL HISTORY

### A.    The Parties and Princeton's Marketplace Updates

Both NJ PURE and Princeton sell medical malpractice insurance in New Jersey. Princeton's Statement of Material Facts Not in Dispute ("SMF") ¶¶ 1–2.  As a requirement to write medical malpractice insurance in New Jersey, insurers are required to submit financial and other information to the New Jersey Department of Banking and Insurance ("DOBI") on an annual basis.

2

In the industry, these filings are known as "Annual Statements."  SMF ¶ 3.  NJ PURE and Princeton file an Annual Statement each year.  *Id.*

In the years 2005 – 2012,[1] each year, Princeton created a publication entitled "Marketplace Update – Prepared for Authorized Agents of Princeton Insurance – [Year]" ("the Princeton Marketplace Updates").  SMF ¶ 4.[2]  Each Princeton Marketplace Update contained a chart that reflected certain financial indicators for several companies that sold medical malpractice insurance in New Jersey.  SMF ¶ 6.  While some of the insurers and some of the financial indicators changed over time, each Princeton Marketplace Update included NJ PURE and Princeton.  *Id.*  The Princeton Marketplace Updates also contained narratives which provided explanatory information about the financial indicators that appeared in them.  SMF ¶ 9.  The financial indicators in the Princeton Marketplace Updates were, with a single exception,[3] obtained from information in the Annual Statements filed by each company.  SMF ¶ 7.

The financial indicators in any given Princeton Marketplace Update did not always show that Princeton had the "best" number, or that NJ PURE had the "worst" number.  For example, for

---

[1] Although Princeton published Marketplace Updates in 2005 and 2006, this Court has previously held that, in light of the six-year statute of limitations on NJ PURE's Lanham Act claim, discovery was only allowed from six years before the Verified Complaint was filed on April 10, 2013.  Dkt. No. 13-2286, Doc. No. 58, pp. 12–13.  Therefore, the relevant time period for purposes of this action begins no earlier than April 10, 2007.

[2] Princeton's 2012 Marketplace Update, reflecting information for the year ending December 31, 2011, is attached as Exhibit A to the Verified Complaint.  The first pages only of each of Princeton's 2006 – 2012 Marketplace Updates are attached to the Verified Complaint as Exhibit B.  SMF ¶ 4.

[3] That exception was in Princeton's 2012 Marketplace Update.  This Update accuracy reflected each insurer's current rating from A.M. Best & Company ("A.M. Best").  A.M. Best is an entity which provides ratings "on the financial stability of insurers and the insurance industry."  *About A.M. Best*, A.M. Best Company, Inc., http://www.ambest.com/about/ (last visited February 15, 2018).  A.M. Best provides ratings ranging from A++ to D.  *Financial Strength Rating Guide*, A.M. BEST COMPANY, INC., http://www.ambest.com/ratings/guide.pdf (last visited February 15, 2018).  A.M. Best ratings are not in Annual Statements.

the financial indicator "Loss/LAE Ratio," NJ PURE's number is lower, i.e., better, than Princeton's number in the 2007, 2010, 2011 and 2012 Princeton Marketplace Updates.  *See* Verified Complaint Exs. A (as to Loss/LAE Ratio, "usually … the lower the percentage, the better"), and B.

Princeton decided to create its Marketplace Updates because it perceived a need to combat rumors in the marketplace about Princeton's financial health.  SMF ¶ 13.  Princeton had recently lost its A.M. Best rating.  As acknowledged by NJ PURE's Eric Poe, its current Chief Operating Officer and designated Rule 30(b)(6) witness, "NJ PURE, as well as the insurance industry as a whole, consider[s] A.M. Best, founded in 1899, with its sole objective to rate insurance companies' strength, to be the foremost authority on rating the financial strength of insurance companies." Fleischer Decl. Exs. 3 and 19 at 273:13–274:3.  Because Princeton had lost this valuable financial rating, and in light of rumors concerning its financial condition, Princeton created its Marketplace Updates "to show how we're doing financially, [and] how were [the competitors] doing." Fleischer Decl. Ex. 27 at 41:11–17.

The Princeton Marketplace Updates were thus an educational publication that Princeton distributed to its producers each year.  *See* SMF ¶¶ 10, 14.  In response to the question, "[w]hat do you know about Princeton's intent in publishing the [Princeton] [M]arketplace [U]pdate[s]…?," Mr. Poe testified that Princeton's "intent was to dispel the fears that they were having regarding the marketplace").  Fleischer Decl. Ex. 20 at 641:19–642:8.  NJ PURE has admitted that "virtually every sentence" contained in the Princeton Marketplace Updates "probably could be construed as true."  Fleischer Decl. Ex. 21 at 716:12–717:3, Ex. 22 at 97:5–13 (the Princeton Marketplace Updates contain "true numbers").  Notably, Princeton stopped publishing its Marketplace Updates in 2012 (the year before NJ PURE filed the Verified Complaint against Princeton), because, in that

year, Princeton's A.M. Best rating was restored at A+ (Superior), thereby making its Marketplace Updates no longer necessary.  SMF ¶ 15.

NJ PURE was aware of the Princeton Marketplace Updates each year they were published "within a month or two" after each publication, but never objected to Princeton about the Marketplace Updates, SMF ¶ 16, nor ever produced any advertising or communications to its insureds or physicians generally in New Jersey about a Princeton Marketplace Update.  Fleischer Decl. ¶ 34.

The only time before this lawsuit that NJ PURE complained about a Princeton Marketplace Update was in December 2010.  Then, without informing Princeton, NJ PURE wrote a letter to DOBI's commissioner complaining about the Princeton Marketplace Updates and asked DOBI to stop Princeton from publishing them.  Fleischer Decl. Ex. 4.  DOBI never acted to stop Princeton from publishing its Marketplace Updates, and Princeton published two more Princeton Marketplace Updates after NJ PURE's December 2010 letter.  *See* SMF ¶¶ 21–22.

Not only did DOBI not stop Princeton, but, quite to the contrary, in February 2011, DOBI issued guidance to the marketplace in the form of a bulletin that effectively blessed the continued publication of the Princeton Marketplace Updates.  This guidance, Bulletin 11-01, did not expressly reference the Princeton Marketplace Updates.  Fleischer Decl. Ex. 5.  However, the Bulletin acknowledges that comparative advertisements by insurers are permissible.  Bulletin 11-01 states, in pertinent part, that if an insurer does publish an advertisement that "includes financial information of competitors, such as surplus, assets or premium, the same information must be presented for the advertising insurer."  *Id.*  Of course, for each and every financial indicator which was presented in a Princeton Marketplace Update, both for NJ PURE and all other insurers, that same financial indicator was also presented for Princeton.  *See* Verified Complaint Ex. B.

**B.    NJ PURE's Lawsuit Against Boynton & Boynton and Allegations of Wrongdoing Against Other Producers in the Marketplace**

In September 2012, long before NJ PURE brought its lawsuit against Princeton, NJ PURE filed a lawsuit against Boynton and Byrne (collectively "the Boynton Defendants").  SMF ¶ 28. Boynton is a producer of medical malpractice insurance in New Jersey and Byrne was one of Boynton's employees.  SMF ¶ 29.  NJ PURE, notably, does not utilize independent producers such as Boynton to sell its medical malpractice insurance.  SMF ¶ 30.

In the *Boynton* Action, which is still pending, NJ PURE alleges that the Boynton Defendants made various "false written and oral statements to the public" concerning NJ PURE's financials.  Fleischer Decl. Ex. 6 at ¶ 18.  NJ PURE's Second Amended Complaint (the current operative pleading pending against the Boynton Defendants) refers to several emails sent by Byrne which allegedly contain false and misleading information concerning various aspects of NJ PURE's finances.  *Id.* at ¶¶ 25–39.  NJ PURE also alleges that the Boynton Defendants distributed the Princeton Marketplace Updates, as well as different "marketplace updates" that were independently created and published by Boynton.  *Id.* at ¶¶ 40–91.

In December 2012, NJ PURE filed a Declaration in the *Boynton* Action signed by Eric Poe, NJ PURE's current Chief Operating Officer.  Fleischer Decl. Ex. 7.  Poe's Declaration alleges that a physicians group known as University Radiology Group ("URG") had allegedly "expressed an interest in purchasing medical malpractice insurance from NJ PURE," but that URG later expressed allegations about NJ PURE that were "identical" to statements contained in emails sent by Byrne to another physician's group "regarding NJ PURE's A.M. Best rating and NJ PURE's

reinsurer." *Id*. at ¶¶ 4–5.  Poe declared that "*as a result* of these false allegations … [URG] chose not to continue pursuing purchasing a policy from NJ PURE."  *Id*. at ¶ 6 (emphasis added).[4]

NJ PURE has also alleged wrongdoing by various other producers that sell medical malpractice insurance in New Jersey.  On May 16, 2013, outside counsel for NJ PURE sent cease and desist letters to five different producers: (1) The NIA Group; (2) PriMed Consulting; (3) Bollinger Insurance Solutions; (4) MBS Insurances Services, Inc.; and (5) Cornerstone Professional Liability Consultants.  Fleischer Decl. Ex. 8.  Each of these letters states that "[i]t has been brought to our attention that several agents and brokers have resorted to unfair trade practices by making derogatory remarks regarding NJ PURE" and that "such statements were a direct violation of N.J.S.A. § 17:29B-4," and otherwise referred the producers to NJ PURE's complaint against the Boynton Defendants.  *Id*.  NJ PURE sent these letters because it was concerned that the producers were allegedly "badmouthing" NJ PURE in the marketplace.  SMF ¶ 40.

## C.   NJ PURE Asserts the Marketplace Updates Are False and Misleading and Files a Lawsuit against Princeton

On April 10, 2013, nearly eight months after it started the *Boynton* Action, NJ PURE filed a Verified Complaint against Princeton,[5] alleging that the Princeton Marketplace Updates contained false and misleading statements concerning NJ PURE.  SMF ¶ 41.  NJ PURE also sought a permanent injunction to prevent Princeton from publishing its Marketplace Updates.  *Id.*  On April 19, 2013, Your Honor denied injunctive relief.  SMF ¶ 46.  NJ PURE subsequently filed a motion for reconsideration, which Your Honor also denied.  SMF ¶ 47.

---

[4] As discussed more fully below, with a single exception not here relevant, discovery has established that NJ PURE is claiming the very same damages in both the Boynton Action and the Princeton Action.

[5] See Paragraphs 42 to 43 of the Statement of Material Facts not in Dispute regarding the denomination of Princeton in this matter.

NJ PURE alleged that, as a result of the Princeton Marketplace Updates, it suffered "pecuniary harm in the form of loss of former medical malpractice liability policyholders, delays in obtaining new medical malpractice liability policyholders and the loss of prospective contracts with potential medical malpractice liability policyholders."  Verified Complaint ¶¶ 70–71.  The Verified Complaint has not been amended and is the operative pleading against Princeton today.

Unlike the claims in the *Boynton* Action, which are based on written marketing materials, emails, and oral statements, NJ PURE's allegations against Princeton are based exclusively on just one form of communication, the Princeton Marketplace Updates.  Judge Wolfson, in her March 23, 2015 Opinion denying NJ PURE's motion to consolidate the *Boynton* Action and the *Princeton Action*, said that "in the *Princeton* Action, NJ PURE seeks redress for alleged harms caused by [Princeton's publication of the Marketplace Updates]" and that NJ PURE's common law claims against Boynton "relating to false and/or misleading oral representations regarding NJ PURE's financial condition … are not part of the *Princeton* Action."  Dkt. No. 13-2286, Doc. No. 72, p. 2.  Judge Bongiovanni, in her June 16, 2014 Order, said that "there are no allegations in the Verified Complaint that identify any alleged marketing or advertising … upon which any claim is allegedly based, except for the Marketplace Updates."  Dkt. No. 13-2286, Doc. No. 58, p. 14.

Additionally, the Verified Complaint does not contain any allegations that Princeton is responsible for any actions or inactions of the Boynton Defendants, whether based on agency principles or otherwise.  *See generally* Verified Complaint.

**D.**     **Judge Wolfson Denies NJ PURE's Motion to Consolidate the Matters for Trial**

In August 2014, despite voluntarily filing separate actions, NJ PURE filed a motion to consolidate the two cases.  In her March 23, 2015 Opinion, Judge Wolfson denied the motion "for trial purposes" because "the *Boynton* Action clearly contains unrelated claims and allegations …

that are not present in the *Princeton* Action." Dkt. No. 13-2286, Doc. No. 72, p. 2. However, the Court did order consolidation proper with respect to discovery only, and NJ PURE, the Boynton Defendants and Princeton have completed discovery on a coordinated basis. Accordingly, the *Boynton* Action and the *Princeton* Action will be tried separately.

**E.**    **NJ PURE's Allegations of Lost Business**

NJ PURE has never conducted any surveys of physicians to determine whether the Princeton Marketplace Updates were misleading to actual or prospective purchasers of medical malpractice insurance. Fleischer Decl. Ex. 9. NJ PURE also has never surveyed or otherwise analyzed how doctors in New Jersey perceive NJ PURE. Fleischer Decl. Ex. 21 at 753:25–755:3.

NJ PURE's damages claims are in the report of Michael Soudry. Mr. Soudry's operative report[6] was served on September 15, 2017 (the "Soudry Report"), in which NJ PURE identifies the physicians it claims it has lost.[7] The Soudry Report identifies just two medical practices that NJ PURE claims were influenced by the conduct of the Boynton Defendants and Princeton: (1) URG and (2) Pulmonary and Allergy Associates ("PAA"). Fleischer Decl. Ex. 10, p. 3. The

---

[6] In April 2016, Mr. Soudry issued a report, which he referred to as a "preliminary analysis." In May 2016, he issued a second report, which he referred to as an "analysis." In August 2017, Judge Bongiovanni held that NJ PURE could not use certain information contained in Mr. Soudry's prior reports, and ordered NJ PURE to serve a revised economic report. Dkt. No. 13-2286, Doc. No. 137, pp. 7, 22–23. On September 15, 2017, NJ PURE served its revised economic report, Mr. Soudry's third report. Fleischer Decl. Ex. 10. Thus, the September 15, 2017 Soudry Report is NJ PURE's operative economic expert report.

[7] Notably, during the deposition of Mr. Poe, in response to Princeton counsel's inquiry concerning what physicians allegedly did not purchase insurance from NJ PURE because of any allegedly false and/or misleading aspects of the Marketplace Updates, counsel for NJ PURE stated that "we've already provided you with an expert report identifying those doctors …." Fleischer Decl. Ex. 21 at 685:22–690:9. That report is the Soudry Report. Fleischer Decl. Ex. 10.

Soudry Report then calculates NJ PURE's alleged economic loss as a result of not insuring URG and PAA.[8]

However, Mr. Soudry does not opine on causation.  Instead, he analyzes the "economic loss" "*assuming* that but for the *defendants'* misleading and/or false comparative advertisements *and emails*,[9] the two medical practices would have become members of NJ PURE."  Fleischer Decl. Ex. 10, p. 3 (emphasis added).  The Soudry Report does not state that any economic loss was due solely to Princeton's Marketplace Updates.  Rather, Mr. Soudry opines on the alleged combined effects of the separate actions of the Boynton Defendants and Princeton as the assumed cause of the losses NJ PURE claims.  *Id.*[10]

**F.      The Record Contains No Evidence that URG, PAA or Any Other Potential Insured Did Not Purchase Insurance from NJ PURE Because of a Princeton Marketplace Update**

     **(a) NJ PURE Cannot Identify a Single Insured that Did Not Purchase Insurance from NJ PURE Because of a Princeton Marketplace Update**

Four NJ PURE representatives were deposed in this matter: Eric Poe, Dr. Lena Chang, Michael Kochnover and Joanna Quaintance (formerly Joanna Elias).  SMF ¶ 59.  None of them could identify a single insured that did not purchase insurance from NJ PURE because of a Princeton Marketplace Update.  Mr. Poe, NJ PURE's Chief Operating Officer and who previously held the title of Chief Marketing and Business Development Officer for NJ PURE, was designated as NJ PURE's Rule 30(b)(6) witness, including with respect to the topic of identifying any

---

[8] Princeton, and the Boynton Defendants, each served their own expert reports on October 20, 2017, including reports responding to the Soudry Report.

[9] The "emails" refer solely to the Boynton Defendants, not to Princeton.

[10] NJ PURE has also served a report of Eric van den Heuvel, an executive at The Gate Media, that concerns alleged corrective advertising costs.  However, like the Soudry Report, it offers no facts or opinions on causation.

physicians whom NJ PURE claimed it lost or did not obtain because of a Princeton Marketplace Update.  SMF ¶¶ 60–62.

Mr. Poe, who has been with NJ PURE since its inception, testified that he could not recall the names of any such physicians.  Fleischer Dec. Ex. 19 at 69:23–70:9 (the names of any such physicians "would be beyond me being able to recall"); 83:20–84:3 (same).  Dr. Lena Chang, NJ PURE's co-founder and CEO and the individual who signed the Verified Complaint, was also deposed.  SMF ¶ 64.  Dr. Chang testified that she could not identify any specific physicians and that she wasn't "generally involved" with policyholders.  Fleischer Decl. Ex. 23 at 281:16–283:5.

The NJ PURE employees who were involved in the day-to-day aspects of selling NJ PURE's insurance products testified similarly.  Michael Kochnover, NJ PURE's former Director of Marketing and Business Development, who was previously responsible for "head[ing] up [NJ PURE's] sales team," SMF ¶ 66, could not recall the names of any individuals who did not purchase insurance from NJ PURE because of a Princeton Marketplace Update.  Fleischer Decl. Ex. 25 at 51:17–55:1 ("I don't recall any names.").  Mr. Kochnover was also not aware of any documents that would contain such information.  *Id.* (failing to identify any notes).

Joanna Quaintance, NJ PURE's former Assistant Director of Marketing and New Business Development, whose job it was to create business for NJ PURE, SMF ¶ 69, also could not identify a single insured that did not purchase insurance from NJ PURE because of a Princeton Marketplace Update.  Fleischer Decl. Ex. 26 at 43:5–9.  Similar to Mr. Kochnover, Ms. Quaintance could not identify any documents, including NJ PURE's own sales notes, which indicated that any physician did not purchase insurance from it because of concerns about its financial health.  *Id.* at 66:24–67:4.

**(b) There is No Evidence that URG or PAA, the Only Two Physician Groups that NJ PURE Claims as Lost Business, Ever Read a Princeton Marketplace Update and Each Provided Other Reasons Why They Did Not Join NJ PURE**

Although NJ PURE claims, with no evidence, that URG and PAA did not buy insurance from them as a result of the conduct of Princeton (and the Boynton Defendants), and the Soudry Report assumes this to be true, the factual record, including testimony from executives at URG and PAA, completely undermines these claims.

**(i)    URG**

Franca Hobbs, Esq., URG's general counsel, was deposed in January 2016.  SMF ¶ 73. Ms. Hobbs's job responsibilities included evaluating medical malpractice insurers and making recommendations to URG's senior management team regarding medical malpractice purchasing decisions.  SMF ¶ 74.  It was Ms. Hobbs who was solicited by Mr. Poe, Mr. Kochnover, and Ms. Quaintance of NJ PURE in 2012 in an attempt to sell medical malpractice insurance to URG.  Ms. Hobbs met with NJ PURE in the spring of 2012.  SMF ¶ 75.

Ms. Hobbs testified that she had no recollection of ever reviewing a Princeton Marketplace Update, Fleischer Decl. Ex. 29 at 69:13–15, and there is no evidence that anyone at URG ever did. SMF ¶ 77.  Mr. Poe testified that he did not know if Ms. Hobbs ever received a Princeton Marketplace Update.  Fleischer Decl. Ex. 20 at 574:5–8.  Indeed, in response to a question concerning whether Ms. Hobbs ever read a Princeton Marketplace Update, Mr. Poe candidly testified "I am not Franca Hobbs, so I cannot know whether or not she read it.  Even if she glanced at the Marketplace Update, I don't know if she reads.  So she could sit in front of a Marketplace Update and I still couldn't attest to what Franca Hobbs read or did not read."  Fleischer Decl. Ex. 19 at 78:25–79:9.  NJ PURE also admitted that Ms. Hobbs never identified the Princeton Marketplace Updates as a reason why URG did not join NJ PURE.  *Id.* at 77:21–78:7 ("So did she

say … I am not comfortable because of the information [contained] in the marketplace update? No she did not say that.").  NJ PURE also admits that the Princeton Marketplace Updates were not discussed during their meeting with Ms. Hobbs.  Fleischer Decl. Ex. 25 at 125:4–126:7.

The undisputed record not only establishes that the Princeton Marketplace Updates had nothing to do with URG's purchasing decision, but, to the contrary, the record is replete with undisputed substantial evidence why URG rejected NJ PURE.  URG was simply uninterested in switching from its current medical malpractice carrier.  Fleischer Decl. Exs. 13 and 26 at 126:18–25.  Additionally, Ms. Hobbs testified that URG was required to obtain its medical malpractice from an A.M. Best-rated carrier, which NJ PURE was not in 2012.  SMF ¶¶ 81–84.

But perhaps the single biggest reason why URG did not switch to NJ PURE was because Ms. Hobbs determined that Eric Poe had lied to her.  On April 12, 2012, Ms. Hobbs emailed Eric Poe, requesting documentation "as to NJ PURE's rating and by whom it is rated."  Fleischer Decl. Ex. 14.  In response and in an effort to obtain URG's business, on April 25, 2012, Eric Poe emailed Ms. Hobbs.  Mr. Poe's email stated that he was supplying her with "the official A.M. Best Capital Adequacy Ratio (BCAR) score and report for NJ PURE."  Mr. Poe also stated "that NJ PURE's 183.6 BCAR score qualifies us for an A++ (Superior) rating."  Fleischer Decl. Ex. 15.

However, in truth, NJ PURE was not rated by A.M. Best and had no "official" A.M. Best score of any kind.  In fact, NJ PURE did not even apply for an A.M. Best rating because Eric Poe knew that "it wouldn't be favorable … it wouldn't be an A rating."[11]  Fleischer Decl. Ex. 26 at

---

[11] Notably, on May 25, 2012, NJ PURE received a cease and desist letter from an attorney representing AM Best regarding Poe's representation to Hobbs in his April 25, 2012 email.  In this letter A.M. Best charged Mr. Poe with making "false" and "intentional misrepresentations to the public by falsely asserting that its 183.6 BCAR score [which NJ PURE self-calculated] qualifies us for an A++ (Superior) rating … it does not."  The letter concluded by demanding that NJ PURE take certain corrective action.  Fleischer Decl. Ex. 16.

134:9–16.  When Ms. Hobbs learned that NJ PURE was not rated by A.M. Best, NJ PURE was eliminated from consideration.  Fleischer Decl. Ex. 29 at 43:19–44:19 ("Once I was advised by the person at A.M. Best that something had been misrepresented to me, that was it.  I was done because I do not deal with people who are not one hundred percent forthright and honest, and I would never put my company in that situation, so this whole conversation about financials, it didn't matter because we never got to that."); 49:24–50:3 ("I didn't trust anything that was coming out of [NJ] PURE").

    **(ii)**    **PAA**

Larry Epstein, the former CEO of PAA was deposed in December 2015.  SMF ¶ 89.  At the time that he was solicited by NJ PURE in 2012, Mr. Epstein was the person primarily responsible for obtaining information for PAA concerning malpractice carriers.  SMF ¶ 90.

The record is clear and undisputed that PAA stayed with its current insurer (MD Advantage) for economic reasons having nothing to do with a Princeton Marketplace Update.  *See* SMF ¶ 91.  If PAA had switched from MD Advantage to NJ PURE, it would have lost a significant capital contribution of at least $150,000 which it had made to MD Advantage.  Fleischer Decl. Ex. 30 at 17:14–18:11.  NJ PURE's sales notes, created by Ms. Quaintance of NJ PURE, as well as testimony from Mr. Kochnover and Ms. Quaintance, corroborate Mr. Epstein's testimony.  Indeed, these sales notes state that PAA's capital contribution to MD Advantage was "the determining factor" in PAA remaining a MD Advantage insured, as well as the fact that MD Advantage matched the rate NJ PURE was offering.  Fleischer Decl. Ex. 17.  *See also* Fleischer Decl. Exs. 25 at 122:22–123:5 (acknowledging knowledge of PAA's capital contribution) and 26 at 192:23–196:2 (acknowledging accuracy of NJ PURE's sales notes regarding PAA's capital contribution).  It simply made no economic sense for PAA to switch insurers.

Similar to Ms. Hobbs, Mr. Epstein did not recall reviewing a Princeton Marketplace Update.  Fleischer Decl. Ex. 30 at. 33:17–34:18.  Mr. Kochnover and Ms. Quaintance also both could not identify any facts to support the contention that PAA did not purchase insurance from Princeton because of a Princeton Marketplace Update.  Fleischer Decl. Exs. 25 at 123:6–10 (with regards to PAA, no one ever said "I'm not joining you because of the Princeton marketplace update") and 26 at 190:18–23.

### G.    This Court Authorizes the Filing of Summary Judgment Motions against NJ PURE

In light of this factual record, Princeton (and the Boynton Defendants in the *Boynton* litigation) requested leave to file motions for summary judgment on certain limited grounds (including lack of causation) prior to expert depositions in this matter, while reserving the right to file, if necessary, additional dispositive or *Daubert* motions following the conclusion of expert depositions.  Dkt. No. 13-2286, Doc. No. 141.  On December 28, 2017, Magistrate Judge Bongiovanni held a case management conference and stated that the Court intended to grant the requests of Princeton and the Boynton Defendants to file such dispositive motions.  Dkt. No. 13-2286, Dec. 28, 2017 Minute Entry.  On January 9, 2018, pursuant to the Court's instructions, the parties filed a joint letter, setting forth the basis of forthcoming dispositive motions, as well as enclosing a proposed Case Management Order authorizing the filing of, and setting forth a briefing schedule for such motions.[12]  Dkt. No. 13-2286, Doc. No. 143.  Judge Bongiovanni entered the requested Case Management Order on January 10, 2018.  Dkt. No. 13-2286, Doc. No. 144.

Accordingly, Princeton submits this brief in support of its motion for summary judgment.

---

[12] In this correspondence, Princeton expressly reserved the right to file, if necessary, any future motions for summary judgment on any other basis (including that the Princeton Marketplace Updates are not false or misleading), as well as any *Daubert* or similar motions with respect to NJ PURE's experts which may be necessary.  Dkt. No. 13-2286, Doc. No. 143.  Princeton continues to reserve its rights to make any such motions.

## GOVERNING LAW

Summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure. The grant of summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact" and the undisputed facts warrant judgment in favor of the moving party as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).  If the moving party can demonstrate that no genuine issue of material fact exists, the burden then shifts to the non-moving party to present evidence that a genuine issue of fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

A factual dispute is material if, under the substantive law, it would affect the outcome of the suit; "factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in its favor.  *See* Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *System Council T-3 of Intern. Broth. of Elec. Workers v. American Tel. & Tel. Co.*, 905 F. Supp. 198, 203 (D.N.J. 1995) *aff'd*, 91 F.3d 125 (3d Cir. 1996).

## ARGUMENT

All of NJ PURE's causes of action require it to show that something false or misleading in a Princeton Marketplace Update caused NJ PURE to lose the potential business of URG and PAA. Therefore, NJ PURE's Verified Complaint must be dismissed in its entirety if NJ PURE cannot demonstrate a genuine issue of material fact on this essential element.

NJ PURE must link the claimed deception with actual harm to its business.  However, the record is entirely devoid of *any* evidence demonstrating that the potential insureds at issue even *read* a Princeton Marketplace Update.  Because NJ PURE has fallen so short, this Court need not

even consider the question of whether NJ PURE has produced evidence to support a jury's finding that the requisite nexus between a false or misleading statement in a Princeton Marketplace Update and an adverse purchasing decision exist.  In fact, the record overwhelmingly proves that the purchasing decisions at issue had absolutely nothing to do with the Princeton Marketplace Updates, let alone something false or misleading in them.  Accordingly, the Verified Complaint must be dismissed in its entirety with prejudice.

Additionally, in the unlikely event Princeton's arguments as to causation (Points I & II) do not fully dispose of NJ PURE's claims, NJ PURE's libel and libel *per se* claims are fundamentally flawed (Points III & IV), providing an additional, independent basis for dismissal of those claims against Princeton.

## I.    NJ PURE MUST PROVE THAT ITS DAMAGES WERE CAUSED BY A PRINCETON MARKETPLACE UPDATE

### A.    GOVERNING LAW

There are five causes of action in the Verified Complaint against Princeton based on Princeton's publication of the Marketplace Updates: a false advertising claim under the Lanham Act, trade libel, libel, libel *per se*, and tortious interference with prospective contractual relations. For all of these causes of action, NJ PURE must prove that the alleged wrongful conduct *caused* the damages at issue.

As NJ PURE argued, and as this Court has agreed and ruled in the *Boynton* Action, a core element of any false advertising claim under the Lanham Act requires that the plaintiff demonstrate that the alleged wrongful conduct caused the damages which the plaintiff claims.  Judge Wolfson's October 1, 2015 Opinion, reported at 141 F. Supp. 3d 298, 305 ("a plaintiff suing under [the Lanham Act] ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers

17

causes them to withhold trade from the plaintiff") (citing *Lexmark International Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 1324 S. Ct. 1377, 1392 (2014)).  As the Supreme Court said in *Lexmark*, "to invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Lexmark*, 134 S. Ct. at 1395.

This has long been the established law in this Court.  In *Parkway Baking Co. v. Friehofer Baking Co.*, 255 F. 2d 641, 648 (3d Cir. 1958), the court held that to recover damages under the Lanham Act, a plaintiff must prove that a false or misleading advertisement "actually deceives a portion of the buying public," as well as that the customer actually relied on that false or misleading advertisement.  *Id.*; *see also U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990) (same); *Mun. Rev. Serv., Inc. v. Xspand, Inc.*, 700 F. Supp. 2d 692, 716 (M.D. Pa. 2010) (when "a plaintiff seeks monetary damages, proof of actual deception is required").

Indeed, when moving to dismiss a counterclaim filed by the Boynton Defendants in that action, NJ PURE itself cited to *Parkway Baking* and *Xspand*, stating that "Boynton must allege that NJ PURE's false or misleading advertisement actually deceives a portion of the buying public, as well as that the customer actually relied on that false or misleading advertisement."  Dkt. No. 12-5610, Doc. No. 90-1, p. 15.

In *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384 (D.N.J. 2009), Judge Wolfson expounded upon what is required to demonstrate causation in a false advertising claim brought under the Lanham Act.  Judge Wolfson observed that "a plaintiff seeking monetary … relief must show actual damages rather than a mere tendency to be damaged."  *Id.* at 481 (internal citations omitted).  "The *plaintiff must link the deception with actual harm* to its business.

18

Actual damages cannot exist *without a nexus between a false advertisement and an adverse purchasing decision*." *Id.* (emphasis supplied) (internal citations omitted).

NJ PURE is also required to demonstrate causation to recover the damages it claims under its various state law causes of action.  *E.g.*, *Vospugh v. Kierce*, 437 N.J. Super. 218, 234 (App. Div. 2014) (tortious interference requires that the plaintiff demonstrate "a reasonable likelihood that the interference caused the loss of the prospective gain"); *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996) (as to tortious interference with prospective economic relations, a "plaintiff must show that if there had been no interference, there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits"); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993) (under New Jersey law, a claim for tortious interference with prospective economic relationships must include proof of damages caused by the alleged interference); *Enriquez v. West Jersey Health Sys.*, 342 N.J. Super. 501, 524 (App. Div. 2001) (as to trade libel, the alleged wrongful communication must materially induce the harm alleged); *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (an action for trade libel requires that special damages be proven with particularity); *Patel v. Soriano*, 369 N.J. Super. 192, 247 (App. Div. 2004) (proof of damages caused by the alleged trade libel is essential); *McLaughlin v. Rosanio, Bailets & Talamo, Inc.*, 331 N.J. Super. 303, 319–20 (App. Div. 2000) (claims of pecuniary harm require a showing of "concrete proof").[13]

---

[13] In addition to damages, NJ PURE has also requested a permanent injunction.  A permanent injunction may issue only where, among other things, a party has actually succeeded on the merits of its claim.  *E.g.*, *Chao v. Rothermel*, 327 F.3d 223 (3d Cir 2003); *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471 (3d Cir. 1996); *Ciba-Geiby Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844 (3d Cir. 1984).  If Princeton is granted the relief it seeks on this motion, no injunctive relief may issue.

**B.    The Record is Entirely Devoid of Any Evidence of Causation Sufficient to Create a Genuine Issue of Material Fact**

There is no evidence that URG or PAA ever read a Princeton Marketplace Update. Therefore, because there is no causal link between a Princeton Marketplace Update and a purchasing decision, NJ PURE's claims fail as a matter of law.

NJ PURE claims that it lost two potential insureds, URG and PAA, because of the alleged wrongful conduct of the Boynton Defendants and Princeton.  Fleischer Decl. Ex. 10, p. 3.  Notably, NJ PURE's economist, Michael Soudry, *assumes* that "but for" alleged wrongful conduct, URG and PAA would have become NJ PURE insureds.  *Id.*

However, NJ PURE cannot point to a single piece of evidence in the record which supports the contention that a Princeton Marketplace Update caused URG or PAA not to buy insurance from NJ PURE.  To the contrary, the record is replete with evidence that directly contradicts NJ PURE's contentions and that eviscerates its claims.

Ms. Hobbs, URG's general counsel, was deposed on January 20, 2016.  NJ PURE targeted and spoke with Ms. Hobbs in an effort to secure URG's business.  However, Ms. Hobbs had no recollection of ever reviewing a Princeton Marketplace Update, and testimony from NJ PURE's own witnesses corroborates Ms. Hobbs' sworn statement.  Fleischer Decl. Exs. 19 at 574:5–8 (did not know if Ms. Hobbs ever received a Princeton Marketplace Update), 25 at 125:4–126:7 (the Princeton Marketplace Updates were not discussed during the meeting with Hobbs), and 29 at 69:13–15.

URG did not purchase insurance from NJ PURE for several reasons which are entirely unrelated to Princeton or its Marketplace Updates.  For one, to the extent Ms. Hobbs was ever considering NJ PURE, when she learned that Eric Poe had made a misrepresentation to her

concerning NJ PURE's A.M. Best rating,[14] NJ PURE was completely eliminated from consideration.  Fleischer Decl. Ex. 29 at 43:19–44:19 ("I was done because I do not deal with people who are not one hundred percent forthright and honest, and I would never put my company in that situation, so this whole conversation about financials, it didn't matter because we never got to that."); 49:24–50:3 ("I didn't trust anything that was coming out of [NJ] PURE").  Additionally, according to Ms. Hobbs, URG was required to obtain medical malpractice from an A.M. Best-rated carrier.  *Id.* at 62:15–22.  As NJ PURE was not an A.M. Best-rated carrier, it appears that NJ PURE *was not even an option* had URG ever seriously considered NJ PURE.

As to PAA, Larry Epstein, its former CEO and the individual solicited by NJ PURE, was deposed on December 22, 2015.  SMF ¶ 89.  As CEO, Mr. Epstein was responsible for obtaining information about and evaluating malpractice carriers.  SMF ¶ 90.  Similar to URG, Mr. Epstein does not recall ever reviewing a Princeton Marketplace Update, and NJ PURE's witnesses also could not identify any facts to suggest that he ever did.  Fleischer Decl. Exs. 25 at 123:6–10 (with regards to PAA, no one ever said "I'm not joining you because of the Princeton marketplace update"), 26 at 190:18–23, and 30 at 33:17–34:18.

Also similar to URG, Mr. Epstein provided a concrete reason why PAA did not join NJ PURE:  PAA had made a significant capital contribution to its current insurer (MD Advantage) of at least $150,000 and PAA would lose that contribution if it switched insurance carriers.  Fleischer Decl. Ex. 30 at 17:14–18:11.  Thus, because MD Advantage ultimately matched NJ PURE's

---

[14] Despite the fact that NJ PURE was not an A.M. Best-rated carrier in 2012, on April 25, 2012, Eric Poe emailed Ms. Hobbs and stated, in pertinent part, that he was supplying her with "the official A.M. Best Capital Adequacy Ratio (BCAR) score and report for NJ PURE."  Mr. Poe also stated in this email "that NJ PURE's 183.6 BCAR score qualifies us for an A++ (Superior) rating." Fleischer Decl. Ex. 15.  A month later, NJ PURE received a cease and desist letter from an attorney representing A.M. Best regarding Poe's representation to Hobbs.  Fleischer Decl. Ex. 16.

offered rate, PAA would have increased its medical malpractice insurance costs by switching to NJ PURE.  Critically, NJ PURE's own sales notes are explicit that PAA's capital contribution to MD Advantage was "the determining factor" in PAA remaining a MD Advantage insured, as does testimony from Mr. Kochnover and Ms. Quaintance.  Fleischer Decl. Exs. 17, 25 at 122:22–123:5, and 26 at 192:23–196:2 (acknowledging accuracy of NJ PURE's sales notes regarding PAA's capital contribution).

NJ PURE has absolutely no evidence contradicting this very precise testimony from URG and PAA or the documents which corroborate it.  Indeed, no NJ PURE witness, not its CEO, nor its Chief Marketing Officer, nor the Director of Marketing and head of its sales team nor its former Assistant Director of Marketing and New Business Development, testified that URG or PAA (or any other insured) did not join NJ PURE because of something contained in a Princeton Marketplace Update.  Fleischer Decl. Exs. 19 at 69:23–70:9 (any names of such physicians "would be beyond me being able to recall"), 23 at 281:16–283:5, 25 at 51:17–55:1 ("I don't recall any names."), and 26 at 43:5–9.

Additionally, the documents produced in discovery further undermine NJ PURE's claims and corroborate the testimony provided by Ms. Hobbs and Mr. Epstein.  NJ PURE's own sales notes state that URG was "not interested in switching med mal carriers," and that PAA's capital contribution to MD Advantage was "the determining factor" in PAA remaining a MD Advantage insured.  Fleischer Decl. Exs. 13, 17.  No notes—or documents of any kind—say or suggest that either URG or PAA did not buy insurance from NJ PURE because of a Princeton Marketplace Update.

Consistent with Judge Wolfson's October 2015 Opinion dismissing third-party claims the Boynton Defendants had asserted against Mr. Poe and Ms. Quaintance, NJ PURE's inability to

demonstrate causation is fatal.   In her Opinion, Judge Wolfson noted that Boynton identified alleged misrepresentations made by Mr. Poe and Ms. Quaintance, and that Boynton alleged that it had suffered "substantial economic damages."   141 F. Supp. 3d at 305–06.   However, because Boynton had failed to "allege any loss of sales or damage to its business reputation that was *proximately caused* by [the] Third-Party Defendants," those counts of Boynton's third-party complaint were dismissed.   *Id.* (emphasis added).

*Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570 (E.D. Pa. 1999), *aff'd sub nom Synygy, Inc. v. Scott-Levin*, 229 F.3d 1139 (3d Cir. 2000) is similarly instructive.   In *Synygy*, the plaintiff alleged it was harmed by (a) oral statements made to common customers of the plaintiff and defendant and (b) a portion of a PowerPoint presentation made to potential customers.   *Id.* at 573–74.   The plaintiff asserted Lanham Act claims, as well as commercial disparagement and common law defamation claims.

In granting the defendants' summary judgment motion, with respect to the plaintiff's Lanham Act claim, the court opined as follows regarding the PowerPoint slide at issue:

> I also find that plaintiff fails to make out the fifth essential element of a Lanham Act claim for a likelihood of injury.   The only evidence plaintiff offers as to damages is a document it created that shows [alleged lost profits].   While plaintiff may have suffered a decrease in profits, *plaintiff tenders no evidence as to what caused that decrease.   To the contrary, plaintiff cannot even tender a witness who specifically recalls defendant maligning plaintiff, let alone one who made a business decision based upon the slide*.   If no attendee can remember a false or misleading statement published at the conference, it is unlikely indeed that there would be a resulting injury.   [*Id.* at 578].

With respect to the alleged false oral statements, the Court observed that "there is no evidence whatsoever of a nexus between [the statement at issue] and [the customer's] decision to discontinue business with the plaintiff.   To the contrary, there is ample evidence that there was no causal relationship between the two."   *Id.* at 577.   Because "the plaintiff [could] offer no evidence

23

of any nexus" between the alleged harmful statements and the damages claimed, the Court granted the defendant's motion for summary judgment on all claims. *Id.* at 578–79, 583.

Similarly, in *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 249 F. Supp. 2d 463 (M.D. Pa. 2003), *modified on other grounds*, 401 F.3d 123 (3d Cir. 2005), the plaintiff asserted a false advertising claim under the Lanham Act.  Observing that the plaintiff "must … establish a causal nexus between [the defendant's] alleged false statements and its damages," *Id.* at 540, the Court held:

> The fact that an advertisement was misleading or false does not automatically entitle the plaintiff to damages.  There must be proof of causation, and Santana's evidence on this issue is very thin.  Indeed, it is no more than a mere scintilla as to promotional devices other than the videos.  Thus, summary judgment will be granted to the defendants as to Santana's claim for damages for Lanham Act violations relating to promotional materials other than [two videos where the plaintiff had demonstrated a genuine issue of material fact]. *Id.* at 542.

Notably, the plaintiff in *Santana* established a genuine issue of material fact as to the causation element of its Lanham Act claim by establishing that certain customers recalled the alleged false advertising in the two videos at issue.  *Santana*, 249 F. Supp. 2d at 540–41.  Here, of course, it is undisputed that both Ms. Hobbs of URG and Mr. Epstein of PAA did not recall ever reviewing a Princeton Marketplace Update, there is no evidence that either did, and that each elected not to purchase insurance from NJ PURE for reasons entirely unrelated to Princeton's Marketplace Updates.

In accordance with Judge Wolfson's prior Opinion in the *Boynton* Action and the case law discussed above, because NJ PURE has failed to establish a nexus between the Princeton Marketplace Updates and URG's or PAA's purchasing decisions, the Verified Complaint must be dismissed with prejudice.

II.    **EVEN ASSUMING NJ PURE DID SUFFER SOME ECONOMIC HARM DUE TO NEGATIVE PERCEPTIONS OF ITS FINANCIAL CONDITIONS IN THE MARKETPLACE, WHICH IT DID NOT, NJ PURE DOES NOT EVEN ALLEGE THAT SUCH ECONOMIC HARM IS ATTRIBUTABLE SOLELY TO THE PRINCETON MARKETPLACE UPDATES**

As discussed extensively in Section I, *supra*, NJ PURE must demonstrate causation to sustain its claims for economic damages against Princeton.  Br. pp. 17–24, *supra*.  However, at all times during the course of discovery, NJ PURE has asserted, without proof, that its alleged damages are the result of multiple causes: the Princeton Marketplace Updates, and a wide combination of factors, including emails and oral statements made by the Boynton Defendants, as well as the different "marketplace updates" generated and published independently by Boynton. Indeed, the Soudry Report expressly states that it assumes that URG and PAA would have become NJ PURE insureds "but for the *defendants'* [*i.e.*, the Boynton Defendants and Princeton] misleading and/or false comparative advertisements *and emails*."  Fleischer Decl. Ex. 10, p. 3.

These cases are not consolidated for trial.  Therefore, even if URG and PAA did not join NJ PURE because of something in a Princeton Marketplace Update (which, of course, is not the case), NJ PURE cannot say that the damages about which Mr. Soudry opines relate to the Princeton Marketplace Updates—or Boynton's representations as alleged in the Second Amended Complaint, or the statements Byrne allegedly made to Ms. Hobbs of URG (indeed, NJ PURE previously swore that it was Byrne's statements, and not the Princeton Marketplace Updates, that caused URG not to buy insurance from NJ PURE, Fleischer Decl. Ex. 7 at ¶ 6), or the different Boynton "marketplace updates," or the allegedly derogatory remarks made by five other producers NJ PURE has accused of causing damage in the marketplace.  NJ PURE simply does not know.

This is a problem for NJ PURE because, of course, it is NJ PURE's burden to establish that the damages it alleges were caused *by Princeton*.  *See, e.g.*, *Borough of Fort Lee v. Banque*

*National de Paris*, 311 N.J. Super. 280, 289 (App. Div. 1998) (where plaintiff claims more than one cause of its injury, the burden is on plaintiff to apportion responsibility); *Bracco*, 627 F.Supp. 2d at 481.  The Boynton Defendants and Princeton are separate entities being sued in separate litigations.  These litigations are not consolidated for trial, and there are no allegations that Princeton has any responsibility for what the Boynton Defendants may have said or published, or statements that may have been made by other producers not parties to this litigation.

Because NJ PURE *has not even alleged*, much less provided any evidence, that the required nexus exists between the Princeton Marketplace Updates and the damages that it claims, *e.g.*, *Lexmark*, 134 S.Ct. at 1395; *Bracco*, 627 F. Supp. 2d 481; *MacDougall*, 144 N.J. at 404, NJ PURE's claims against Princeton, all of which require causation to recover economic damages, must be dismissed in their entirety.

## III.    NJ PURE CANNOT SUSTAIN A CLAIM FOR COMMON LAW LIBEL OR LIBEL *PER SE*

Independent of the fact that NJ PURE cannot recover economic damages under a libel theory without proof of causation, in an apparent effort to conjure up as many claims as possible against Princeton, NJ PURE claims that Princeton's publication of its Marketplace Updates constitutes trade libel, as well as both common law libel and libel *per se*.  However, despite NJ PURE's attempts to dress up its allegations to sustain a defamation claim, NJ PURE's claims sound only in alleged disparagement, *i.e.*, a claim for trade libel.  Accordingly, NJ PURE's libel and libel *per se* claims must be dismissed for this reason as well.

Claims for libel and trade libel stem from different branches of tort law.  *Dairy Stores, Inc. v. Sentinel Pub. Co., Inc.*, 104 N.J. 125, 133 (1986).  "A defamation action, which encompasses libel … affords a remedy for damage to one's reputation.  By comparison, an action for product disparagement [i.e., trade libel], is an offshoot of the cause of action for interference with

contractual relations, such as sales to a prospective buyer." *Id.* "'Defamation is found only where the imputation fairly implied is that the plaintiff is dishonest or lacking integrity, or that he is deliberately perpetrating fraud upon the public by selling a product which he knows to be defective.'" *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 295 (D.N.J. 2016) (quoting *Dairy Stores*, 104 N.J. at 159 (Garibaldi, J. concurring)). "Thus, unless the disparaging statement explicitly imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct … courts will not deem a merely critical statement to be defamatory." *Gillon*, 218 F. Supp. 3d. at 295-296. *See also Patel*, 369 N.J. Super. at 247 (opining that "the rule of liability for trade libel applies" "when the matter published goes no further than to attack the quality of the thing in question and does not attack the personal character of its owner ….").

In *Gillon*, the defendant (Bernstein) published an online review criticizing an event planning company (Gillon) for the services it provided at her son's wedding.  In response, Gillon filed suit against Bernstein, for, among other things, libel and product disparagement.  The *Gillon* court conducted an analysis of product disparagement (trade libel) versus defamation (libel) law, and held that the statements at issue did "not impute fraud, deceit, dishonesty, or reprehensible conduct" to the plaintiff.  *Gillon*, 218 F. Supp. 3d at 296.  Therefore, the *Gillon* court held that the plaintiff's claims "sound[ed] exclusively in product disparagement and cannot be considered defamatory" and dismissed Gillon's defamation claim.  *Id.*

Applying these principles here, the Princeton Marketplace Updates do not impute fraud, deceit, dishonesty, or reprehensible conduct to NJ PURE, nor does NJ PURE so allege in the Verified Complaint.  *See Gillon*, 218 F. Supp. 3d at 296; *Patel*, 369 N.J. Super. at 247.  The Princeton Marketplace Updates displayed the same financial indicators for Princeton, NJ PURE, and other entities which write medical malpractice insurance in New Jersey (obtained from the

Annual Statements filed by each insurer) and provided a description of those indicators.  A review of the Princeton Marketplace Updates makes clear that there was no suggestion that NJ PURE offered fraudulent insurance products, that it engaged in any type of deceitful or reprehensible conduct, or that NJ PURE was otherwise dishonest.[15]

Accepting NJ PURE's allegations in the Verified Complaint at face value, NJ PURE alleges that the Princeton Marketplace Updates misled the marketplace as to NJ PURE's financial health, and that accordingly, its insurance products may be less desirable than Princeton's.  These allegations sound in trade libel, not defamation.  *Gillon*, 218 F. Supp. 3d at 296; *Patel*, 369 N.J. Super. at 248; *Dairy Stores*, 104 N.J. at 134 (courts are generally reluctant to impute a lack of integrity to a corporation merely from a criticism of its product).

Because NJ PURE's allegations sound exclusively in trade libel, and because the Princeton Marketplace Updates did not impute fraud, deceit, dishonesty or reprehensible conduct to NJ PURE, this represents an additional basis why the libel and libel *per se* claims against Princeton must be dismissed.

## IV.   AS A MATTER OF LAW, THE PRINCETON MARKETPLACE UPDATES DO NOT CONSTITUTE LIBEL *PER SE*

NJ PURE's assertions that the Princeton Marketplace Updates constitute libel *per se* are baseless.  For a claim of libel *per se* to survive, the statements at issue must not be "reasonably susceptible of a non-defamatory interpretation."  *Lawrence v. Bauer Publ'g. & Printing, Ltd.*, 89 N.J. 451, 459 (1982).  *See also McLaughlin*, 331 N.J. Super. at 319 ("The term 'defamation *per se*' refers to a statement whose defamatory meaning is so clear on its face that the court is not required to submit the issue to the jury") (citing *Lawrence*, 89 N.J. at 459).  Notably, if an alleged

---

[15] Whether the meaning of a statement is susceptible to a defamatory meaning is a question of law for the court.  *Ward v. Selikovsky*, 136 N.J. 516, 529 (1994).

libelous statement is contingent on extrinsic facts, it cannot constitute libel *per se* as the statement

is not "defamatory on its face."  *See Gillon*, 218 F. Supp. 3d at 302–03.

The Princeton Marketplace Updates are, of course, reasonably susceptible to a non-

defamatory interpretation.  As noted by Your Honor at the outset of this litigation, the Princeton

Marketplace Updates compiled certain publicly available information filed with DOBI.  Critically,

the Princeton Marketplace Updates complied with DOBI's February 2011 Bulletin because they

provided the same financial indicators for both NJ PURE and Princeton, as well as the other

carriers.  Additionally, despite NJ PURE's December 2010 complaint to DOBI, DOBI never took

any action against Princeton as a result of its Marketplace Updates or otherwise indicated that they

were in any way defamatory.[16]  SMF ¶¶ 22–24.  Indeed, even NJ PURE has admitted that the

Princeton Marketplace Updates, on their face, contain true information.  Fleischer Decl. Ex. 21 at

716:12–717:3 (admitting that "virtually every sentence" "probably could be construed as true"),

Ex. 22 at 197:5–13 (the Princeton Marketplace Updates contain "true numbers").

NJ PURE's allegations boil down to the claim that information *not included*, *i.e.* extrinsic

facts, rendered the presentation of these true numbers allegedly misleading.  For example, NJ

PURE alleges that the Princeton Marketplace Updates do not contain all of the financial indicators

which are found in the Annual Statements, Verified Complaint ¶ 37, that Princeton Marketplace

Updates do not contain surplus contribution information for NJ PURE, *id.* at ¶¶ 46–50, and that it

is allegedly inappropriate to compare NJ PURE and Princeton side-by-side because NJ PURE has

a "different business model" which the Princeton Marketplace Updates do not explain.  *Id.* at ¶¶

---

[16] Indeed, DOBI has authority to take action against a medical malpractice insurer for violations
of New Jersey's Insurance Trade Practices Act ("ITPA"), which prohibits false advertising,
N.J.S.A. § 17:29B-4, as DOBI did when it instituted an Order to Show Cause against NJ PURE
for asserted violations of the ITPA in November 2009.  Fleischer Decl. Ex. 18.

39–45.  Because NJ PURE's allegations depend on extrinsic information not contained in the Princeton Marketplace Updates, which are clearly susceptible to a non-defamatory interpretation, NJ PURE cannot sustain a libel *per se* claim as a matter of law.  *Lawrence*, 89 N.J. at 519; *Gillon*, 218 F. Supp. 3d at 302–03.

## **CONCLUSION**

For the foregoing reasons, Princeton's Motion for Summary Judgment must be granted in its entirety, and NJ PURE's Verified Complaint must be dismissed with prejudice.

Dated: February 16, 2018

Respectfully,

Walter J. Fleischer Jr., Esq.
Diego J. Rosado, Esq.
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Phone: (973) 549-7000
*Attorneys for Defendant*
*Princeton Insurance Company*