<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

———————————————————
                                 :

| | |
|---|---|
| BRIAN S. KERN and NEW JERSEY   : | |
| PHYSICIANS UNITED RECIPROCAL   : | |
| EXCHANGE,                             : | |
|                                  : | |
|          Plaintiffs,                : | Civil Action No. 13-02286-BRM-TJB |
|                                  : | |
|         v.                        : | |
|                                  : | **OPINION** |
| THE MEDICAL PROTECTIVE      : | |
| COMPANY, INC. d/b/a PRINCETON   : | |
| INSURANCE COMPANY and DOES 1-10, : | |
|                                  : | |
|         Defendants.            : | |

———————————————————:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is The Medical Protective Company Inc., d/b/a Princeton Insurance Company's ("Princeton") Motion for Summary Judgment. (ECF No 145.) Plaintiff New Jersey Physicians United Reciprocal Exchange ("NJ PURE") opposes the Motion. (ECF No. 146.) Having reviewed the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Princeton's Motion for Summary Judgment is **GRANTED**.

**I.    BACKGROUND**

This case is based on Princeton's allegedly misleading publication of its Princeton Marketplace Updates from 2005 to 2012. (*See* ECF No. 1.)

**A.  The Parties and Princeton's Marketplace Updates**

NJ PURE is a New Jersey not-for-profit reciprocal insurance exchange entity that sells medical malpractice insurance directly to medical providers. (Princeton's Statement of Facts (ECF

No. 145-1) ¶ 1 and NJ PURE's Resp. to Princeton's Statement of Facts (ECF No. 146-4) ¶ 1.) Princeton sells medical malpractice insurance in New Jersey. (ECF No. 145-1 ¶ 2 and ECF No. 146-4 ¶ 2.)

As required by insurance policies in New Jersey, both NJ PURE and Princeton submit financial information to the New Jersey Department of Banking and Insurance ("DOBI") on an annual basis, which is known as an "Annual Statement." (ECF No. 145-1 ¶ 3 and ECF No. 146-4 ¶ 3.) From 2005 to 2012, on an annual basis, Princeton created a publication entitled "Marketplace Update- Prepared for Authorized Agents of Princeton Insurance- [Year]" (the "Princeton Marketplace Updates"). (ECF No. 145-1 ¶ 4 and ECF No. 146-4 ¶ 4.) The Princeton Marketplace Updates contained a chart on the first page demonstrating certain financial indicators for named companies, including but not limited to, NJ PURE and Princeton, that sold medical malpractice insurance in New Jersey. (ECF No. 145-1 ¶ 6 and ECF No. 146-4 ¶ 6.) Some of the information that appeared in the Princeton Marketplace Updates were taken directly from the Annual Statements filed by each company annually to the DOBI, but not all. (ECF No. 145-1 ¶ 7 and ECF No. 146-4 ¶ 7.) The Princeton Marketplace Updates also contained narrative information regarding the financial indicators that appeared in them. (ECF No. 145-1 ¶ 9 and ECF No. 146-4 ¶ 9.)

However, the Princeton Marketplace Updates do not disclose that NJ PURE is a not-for-profit insurance company, while Princeton is for-profit. (ECF No. 146-3 ¶ 4 and ECF No. 147-1 ¶ 4.) NJ PURE alleges this distinction is significant because the Princeton Marketplace Updates described net income as determinative of the insurer's surplus but NJ PURE's surplus contributions are not considered in calculating net income because it is a not-for-profit entity. (ECF No. 146-3 ¶¶ 9-10.) Therefore, NJ PURE alleges the Marketplace Updates advertise that NJ PURE suffered a net loss in four out of the seven years the Princeton Marketplace Updates published,

which is not accurate. (*Id.* ¶ 11.) Notably, Princeton's Marketplace Updates do not state the organizational structure of any insurer. (ECF No. 147-1 ¶ 4.)

The 2012 Princeton Marketplace Update, for the first time, contained an A.M. Best & Company rating category, which the parties admit was accurate. (ECF No. 145-1 ¶ 7 and ECF No. 146-4 ¶ 7.) The A.M. Best & Company is an entity that provides ratings "on financial stability of insurers and the insurance industry," providing ratings ranging from A++ to D. (ECF No. 145-1 ¶ 11 and ECF No. 146-4 ¶ 11 (citation omitted).) Not all companies make the A.M. Best & Company ratings.

The Princeton Marketplace Updates did not always portray Princeton with the best Loss/LAE Ratio or NJ PURE with the worst Loss/LAE Ratio. (ECF No. 145-1 ¶ 8 and ECF No. 146-4 ¶ 8.) In fact, NJ PURE's Loss/LAE Ratio is lower than, i.e. better than, Princeton's number in 2007, 2010, 2011, and 2012. (*Id.*) Princeton distributed its Princeton Marketplace Updates to its producers every year. (ECF No. 145-1 ¶ 10 and ECF No. 146-4 ¶ 10.)

In 2004, Princeton lost its A.M. & Company best rating. (ECF No. 145-1 ¶ 12 and ECF No. 146-4 ¶ 12.) This led to Princeton's creation of the Marketplace Updates to illustrate its financial situations for potential purchasers of its insurance in 2005. (ECF No. 145-1 ¶ 13 and ECF No. 146-4 ¶ 13.) In 2012, Princeton again became A.M. Best Rated and ceased producing and publishing the Princeton Marketplace Updates. (ECF No. 145-1 ¶ 15 and ECF No. 146-4 ¶ 15.)

In 2010, NJ PURE wrote a letter to DOBI complaining about the Princeton Marketplace Updates and requesting that DOBI stop Princeton from publishing it. (ECF No. 145-1 ¶ 19 and ECF No. 146-4 ¶ 19.) However, no letter was sent to Princeton at this time. (*Id.*) In 2011, DOBI issued Bulletin 11-01 to "all authorized or admitted property and casualty insurers" stating in part, "if an advertisement includes financial information of competitors, such as surplus, assets or

premium, the same information must be presented for the advertising insurer." (ECF No. 145-1 ¶¶ 22-23 and ECF No. 146-4 ¶¶ 22-23.) The parties agree that "[e]very Princeton Marketplace Update included financial indicators of medical malpractice insurers in New Jersey including, among other things, surplus, assets and premium information, and every Princeton Marketplace Update also presented that same financial indicator for Princeton for the same year." (ECF No. 145-1 ¶ 25 and ECF No. 146-4 ¶ 25.) Irrefutably, "virtually every sentence" contained in the Princeton Marketplace Updates "probably could be construed as true." (ECF No. 145-1 ¶ 26 and ECF No. 146-4 ¶ 26.)

**B. NJ PURE's Lawsuits Against Other Producers of Medical Malpractice Insurance**

On September 7, 2012, NJ PURE filed a complaint against Boynton & Boynton, Inc. ("Boynton") and Kevin Byrne ("Byrne") (the "Boynton Action" and the defendants there collectively the "Boynton Defendants"). (ECF No. 145-1 ¶ 28 and ECF No. 146-4 ¶ 28.) The second amended complaint in the Boynton Action alleges the Boynton Defendants made "false written and oral statements to the public" regarding NJ PURE's financials. (ECF No. 145-1 ¶ 31 and ECF No. 146-4 ¶ 31.) It also alleges the Boynton Defendants distributed the Princeton Marketplace Updates, as well as different marketplace updates that were created and published by Boynton. (*Id.*)

Boynton produces medical malpractice insurance in New Jersey and Byrne was one of its employees. (ECF No. 145-1 ¶ 29 and ECF No. 146-4 ¶ 29.) Unlike Princeton, NJ PURE does not use producers to sell their medical malpractice insurance products. (ECF No. 145-1 ¶ 30 and ECF No. 146-4 ¶ 30.)

In the Boynton Action, Eric Poe's, NJ PURE's Chief Operating Officer, who previously held the title of NJ PURE's Chief Marketing and Business Development Officer, declaration

asserted that University Radiology Group ("URG") "expressed an interest in purchasing medical malpractice insurance from NJ PURE" in 2012. (ECF No. 145-1 ¶ 33 and ECF No. 146-4 ¶ 33 (citation omitted).) Poe also stated that URG expressed concerns regarding "NJ PURE's A.M. Best[] rating and NJ PURE's reinsurer" and that URG's concerns were identical to statements contained in emails sent by Byrne to other physician groups. (ECF No. 145-1 ¶ 34 and ECF No. 146-4 ¶ 34.) Poe declared "as a result of these false allegations . . . [URG] chose not to continue pursuing purchasing a policy from NJ PURE." (ECF No. 145-1 ¶ 35 and ECF No. 146-4 ¶ 35 (citation omitted).)

On May 16, 2013, NJ PURE sent cease and desist letters to five different producers of medical malpractice insurance in New Jersey The NIA Group, PRiMed Consulting, Bollinger Insurance Solutions, MBS Insurances Services, Inc., and Cornerstone Professional Liability Consultants for making derogatory remarks regarding NJ PURE. (ECF No. 145-1 ¶¶ 36-37 and ECF No. 146-4 ¶¶ 36-37.)

### C. NJ PURE's Allegations Against Princeton

On April 10, 2013, NJ PURE filed a Complaint against Princeton, alleging: (1) unfair competition under the Lanham Act; (2) trade libel; (3) libel; (4) libel *per se*; (5) tortious interference with prospective contractual relationships; and (6) unfair methods of competition and unfair or deceptive acts or practices under the New Jersey Insurance Trade Practices Act. (ECF No. 1.) NJ Pure alleges that because of the Princeton Marketplace Updates it suffered "pecuniary harm in the form of loss of former medical malpractice liability policyholders, delays in obtaining new medical malpractice liability policyholders and the loss of prospective contracts with potential medical malpractice liability policyholders." (*Id.* ¶¶ 70-71.) NJ PURE also sought a permanent injunction to prevent Princeton from publishing its Princeton Marketplace Updates. (ECF Nos. 1-

2 and 1-3.) On April 19, 2013, the Court denied NJ PURE's request for injunctive relief. (ECF No. 6.) NJ PURE's Motion for Reconsideration of the denial of its Motion for Injunctive Relief was denied on February 26, 2014. (ECF No. 50.)

**D. NJ PURE's Lost Business**

On September 15, 2017, NJ PURE filed a revised economic report conducted by Michael Soundry (the "Soundry Report") calculating NJ PURE's alleged economic losses because of the conduct of both Princeton and the Boynton Defendants. (ECF No. 145-1 ¶ 53 and ECF No. 146-4 ¶ 53.) NJ PURE concedes the Soundry Report "does not state that any particular economic loss claimed by NJ PURE was due solely to Princeton's Marketplace Updates." (ECF No. 145-1 ¶ 54 and ECF No. 146-4 ¶ 54.) Instead, the Soundry Report calculates damages allegedly caused by a combination of factors the different marketplace updates that were created and published by Boynton and emails sent by the Boynton Defendants. (*Id.*) The Soundry Report only identifies two potential insureds who allegedly did not purchase insurance from NJ PURE due to the conduct of Princeton and the Boynton Defendants, URG and Pulmonary and Allergy Associates ("PAA"). (ECF No. 145-1 ¶¶ 55-56 and ECF No. 146-4 ¶¶ 55-56.)

However, Franca Hobbs, Esq., URG's general counsel and the individual who was solicited by NJ PURE, did not recall reviewing a Princeton Marketplace Update. (ECF No. 145-1 ¶¶ 73-76 and ECF No. 146-4 ¶¶ 73-76.) In fact, NJ PURE concedes "[t]here is no evidence that anyone at URG ever read a Princeton Marketplace Update." (ECF No. 145-1 ¶ 77 and ECF No. 146-4 ¶ 77.) They further admit Hobbs never stated URG did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. (ECF No. 145-1 ¶ 78 and ECF No. 146-4 ¶ 78.) According to Hobbs, URG was required to obtain medical malpractice from an A.M. Best-rated carrier. (ECF No. 145-1 ¶ 81 and ECF No. 146-4 ¶ 81.) Therefore, on April 12, 2012, she emailed Poe requesting

documents as to NJ PURE's rating. (ECF No. 145-1 ¶ 82 and ECF No. 146-4 ¶ 82.) Poe responded by providing Hobbs with "the official A.M. Best Capital Adequacy Ration (BCAR) score and report for NJ PURE" of 183.6, which NJ PURE alleged qualified them for an A++ rating. (ECF No. 145-1 ¶¶ 82-83 and ECF No. 146-4 ¶¶ 82-83.) However, NJ PURE was not rated by A.M. Best & Company in 2012. (ECF No. 145-1 ¶ 84 and ECF No. 146-4 ¶ 84.)

In fact, on May 25, 2012, NJ PURE received a letter from A.M. Best & Company regarding Poe's misrepresentation about being rated. (ECF No. 145-1 ¶ 86 and ECF No. 146-4 ¶ 86.) Once Hobbs was advised by A.M. Best & Company about the misrepresentation, NJ PURE was eliminated from consideration as a carrier because URG does "not deal with people who are not one hundred percent forthright and honest, and [she] would never put [her] company in that situation, so this whole conversation about financials, it didn't matter because we never got to that." (ECF No. 145-1 ¶ 87 and ECF No. 146-4 ¶ 87 (citation omitted).)

Larry Epstein, the former CEO of PAA and the individual solicited by NJ PURE, also did not recall reviewing a Princeton Marketplace Update. (ECF No. 145-1 ¶ 59 and ECF No. 146-4 ¶ 59.) There is also no evidence that anyone at PAA ever read a Princeton Marketplace Update. (ECF No. 145-1 ¶ 94 and ECF No. 146-4 ¶ 94.) Epstein stated it did not choose to use NJ PURE in 2012 because it would lose a capital contribution of at least $150,000 it made to its carrier. (ECF No. 145-1 ¶ 91 and ECF No. 146-4 ¶ 91.) In fact, NJ PURE's sales notes for PAA establish that PAA's capital contribution to its carrier was "the determining factor" in PAA remaining with its carrier and not choosing NJ PURE. (ECF No. 145-1 ¶ 92 and ECF No. 146-4 ¶ 92 (citation omitted).)

In addition, four NJ PURE representatives were deposed: (1) Poe; (2) Dr. Lena Chang, NJ PURE's co-founder and CEO; (3) Michael Kochnover, former Director of Marketing and Business

Development; and (4) Joanna Quaintance, Assistant Director of Marketing and New Business Development. (ECF No. 145-1 ¶ 59 and ECF No. 146-4 ¶ 59.) Neither of the four representatives could identify a specific potential insured that did not purchase NJ PURE insurance because of the Princeton Marketplace Update. (ECF No. 145-1 ¶¶ 63-72 and ECF No. 146-4 ¶¶ 63-72.)

### E.  Remaining Pertinent Procedural History

On May 5, 2014, the parties filed a stipulation of dismissal of Count IV of NJ PURE's Complaint, unfair methods of competition and unfair or deceptive acts or practices under the New Jersey Insurance Trade Practices Act. (ECF No. 55.) On March 23, 2015, the Court denied NJ PURE's Motion to Consolidate the Boynton Action and this action for trial on the merits but consolidated it for discovery purposes. (ECF No. 72.) On February 16, 2018, Princeton filed a Motion for Summary Judgment. (ECF No. 145.) NJ PURE opposes the Motion. (ECF No. 146.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in

his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.

*Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.   DECISION

### A.  Causation

There are five causes of action remaining in the Complaint against Princeton based on the Princeton Marketplace Updates: (1) a false advertising claim under the Lanham Act (Count I); (2) trade libel (Count II); (3) libel (Count III); (4) libel *per se* (Count IV); and (5) tortious interference with prospective contractual relations (Count V). Princeton argues all five causes of action require NJ PURE to "prove that the alleged wrongful conduct *caused* the damages at issue." (ECF No. 145-2 at 17.) It further maintains the record is devoid of any evidence of causation sufficient to create a genuine issue of material fact. (*Id.* at 20-24.) Specifically, Princeton contends "the record is entirely devoid of *any* evidence demonstrating that the potential insureds at issue even read a Princeton Marketplace Update." (*Id.* at 16.) Moreover, Princeton maintains URG and PAA did not purchase insurance from NJ PURE for reasons entirely unrelated to the Princeton Marketplace Updates. (*Id.* at 20.)

NJ PURE argues evidence of specific causation is not required to support a Lanham Act claim. (ECF No. 146 at 9-12.) Specifically, it argues that because Princeton employed willfully

deceptive comparative advertisements, causation is presumed. (*Id.* at 10.) NJ PURE further argues

its libel claims "do not require proof of concrete financial damages from specific lost customers."

(*Id.* at 12.)

### 1. Lanham Act

The Lanham Act creates a cause of action against any person who "uses in commerce any

. . . false or misleading description of fact, or false or misleading representation of fact, which . . .

misrepresents the nature, characteristics [or] qualities . . . of his or her or another person's goods,

services, or commercial activities." 15 U.S.C. § 1125(a)(1). The purpose of the Lanham Act is "to

protect persons engaged in such commerce against unfair competition" and "to prevent fraud and

deception." 15 U.S.C. § 1127.

This case is based upon a claim for false advertising. Therefore, the Court's analysis must

begin with Section 43(a) of the Lanham Act. Section 43(a) of the Lanham Act provides, in part:

> (1) Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any word,
> term, name, symbol, or device, or any combination thereof, or any
> false designation of origin, false or misleading description of fact,
> or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to
> deceive as to the affiliation, connection, or association of such
> person with another person, or as to the origin, sponsorship, or
> approval of his or her goods, services, or commercial activities by
> another person, or
>
> (B) in commercial advertising or promotion, misrepresents
> the nature, characteristics, qualities, or geographic origin of his or
> her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes
> that he or she is likely to be damaged by such an act.

15 U.S.C. § 1125(a). To prove a claim of false advertising under the Lanham Act, a plaintiff must

establish the following elements:

> 1) that the defendant has made false or misleading statements as to
> his own product [or another's]; 2) that there is actual deception or at
> least a tendency to deceive a substantial portion of the intended
> audience; 3) that the deception is material in that it is likely to
> influence purchasing decisions; 4) that the advertised goods traveled
> in interstate commerce; and 5) that there is a likelihood of injury to
> the plaintiff in terms of declining sales, loss of good will, etc.

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014). "However, '[i]f a plaintiff proves a challenged claim is literally false, a court may grant relief without considering whether the buying public was misled.'" *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 92 (3d Cir. 2000) (quoting *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994)). In other words, "literally false advertising, by raising a presumption of consumer deception, may support a finding of a casual nexus between defendant's misconduct and plaintiff's injuries." Princeton's Motion for Summary Judgment as to NJ PURE's Lanham Act claim focuses solely on causation. Therefore, the Court will only address causation.

The Lanham Act allows a plaintiff to pursue both monetary damages and injunctive relief. The causation standard for money damages is higher than the standard for injunctive relief:

> [C]ases involving injunctive relief and those seeking monetary
> damages under the Lanham Act have different standards of proof. A
> plaintiff suing to enjoin conduct that violates the Lanham Act need
> not prove specific damage. In contrast, courts require a heightened
> level of proof of injury in order to recover money damages.

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 480 (D.N.J. 2009). A plaintiff seeking monetary damages instead of injunctive relief must establish "actual damages rather than a mere tendency to be damaged." *Id.* (citation omitted). "The plaintiff must line the deception with actual harm to its business." *Id.*; *Labware, Inc. v. Thermo Labsystems, Inc.*, No. 04-2545, 2005 WL 1541028, at *12 (E.D. Pa. June 29, 2005) ("Actual damages cannot exist

without a nexus between a false advertisement and an adverse purchasing decision."). Nevertheless, the Supreme Court has stated "that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133, 134 S. Ct. 1377, 1391, 188 L. Ed. 2d 392 (2014).

NJ PURE argues there is an alleged presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases where the challenged advertising is making a misleading comparison or reference to a competitor's product. (ECF No. 146 at 10.) NJ PURE relies on *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 129 F. Supp. 2d 351, 364 (D.N.J. 2000), *aff'd*, 290 F.3d 578 (3d Cir. 2002), *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 599 (D.N.J. 2003), and *Bracco Diagnostics* for this proposition. (*Id.*) The Court does not agree. First, the *Novartis* case is superseded by the Third Circuit's decision on appeal and *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014). On appeal in the *Novartis* case, the Third Circuit held the district court committed error in relying on the wrong standard in granting relief, but nevertheless affirmed the decision because the error "was harmless because there is sufficient evidence in the record to support a finding of irreparable harm." *Novartis Consumer Health, Inc.*, 290 F.3d at 595. In addition, the Third Circuit has explicitly held "[b]ecause a presumption of irreparable harm deviates from the traditional principles of equity, which require a movant to demonstrate irreparable harm, we hold that there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases." *Ferring Pharm., Inc.*, 765 F.3d at 216.

Nevertheless, even if there was a presumption of irreparable harm, it is just that, a presumption. "Federal Rule Evidence 301 provides the default rule for how presumptions operate in federal civil cases." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 320 (3d Cir. 2014). The party the presumption operates against must produce evidence to rebut the presumption, while the actual burden of persuasion remains does not change. *Id.* This is entitled the "bursting bubble" theory, where "the introduction of evidence to rebut a presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue." *Id.* (citations omitted).

Here, NJ PURE seeks both injunctive and monetary relief. (ECF No. 1 at 20-21.) Therefore, to prove causation NJ PURE must establish, at a minimum, mere tendency to be damaged for injunctive relief and actual damages for monetary damages, unless it establishes the Princeton Marketplace Updates were literally false.

NJ PURE has not established a genuine issue of material fact as to literal falsity. In fact, the record reveals the opposite. "[O]nly an unambiguous message can be literally false." *Novartis Consumer Health, Inc.*, 290 F.3d at 587 (emphasis omitted). During his deposition, Poe conceded "virtually every individual sentence . . . could be construed as true" in the Princeton Market Place Updates. (Poe Dep. (ECF No. 145-6) at 716:12-717:3; ECF No. 145-1 ¶ 26; ECF No. 146-4 ¶ 26.) Dr. Chang also testified the Princeton Marketplace Updates contain "true numbers," and conceded that, in his opinion, the Princeton Marketplace Updates are misleading and that her opinion "could be wrong, of course." (ECF No. 145-4 at 59.) Lastly, James Corcoran, a supplemental expert provided by NJ PURE, does not state the Princeton Marketplace Updates were literally false,

instead he contends they "were misleading." (Ex. D to ECF No. 146-2 at 23.)[1] As such, there is no evidence to support that the Princeton Marketplace Updates were literally false. Therefore, NJ PURE must establish mere tendency to be damaged for injunctive relief and actual damages for monetary damages.

The Court finds the record is devoid of any evidence of a mere tendency to be damaged, let alone actual damages, to create a genuine issue of material fact. NJ PURE only claims it lost two potential insureds, URG and PAA, because of the Princeton Marketplace Updates. Indeed, the Soundry Report only identifies those two potential insureds as allegedly not purchasing insurance from NJ PURE due to the conduct of Princeton and the Boynton Defendants. (ECF No. 145-1 ¶¶ 55-56 and ECF No. 146-4 ¶¶ 55-56.) However, there is no evidence that either URG or PAA ever read a Princeton Marketplace Update. To the contrary, the record is replete with contrary evidence. Hobbs, URG's general counsel and the individual who was solicited by NJ PURE, did not recall reviewing a Princeton Marketplace Update. (ECF No. 145-1 ¶¶ 73-76 and ECF No. 146-4 ¶¶ 73-76.) Epstein, the former CEO of PAA and individual solicited by NJ PURE, also did not recall reviewing a Princeton Marketplace Update. (ECF No. 145-1 ¶ 59 and ECF No. 146-4 ¶ 59.) Further, NJ PURE concedes there is no evidence that anyone at URG or PAA ever read a Princeton Marketplace Update. (ECF No. 145-1 ¶¶ 77, 94 and ECF No. 146-4 ¶¶ 77, 94.)

NJ PURE further admits Hobbs never stated URG did not purchase insurance from NJ PURE because of a Princeton Marketplace Update. (ECF No. 145-1 ¶ 78 and ECF No. 146-4 ¶ 78.) Hobbs testified that URG was required to obtain medical malpractice from an A.M. Best-rated

---

[1] Princeton argues Corcoran's expert testimony is inadmissible at this stage because it is unsworn and "is not competent evidence for purposes of this motion." (ECF No. 147 at 1 n.2.) Because his testimony is of no consequence the Court need not address this issue.

carrier. (ECF No. 145-1 ¶ 81 and ECF No. 146-4 ¶ 81.) Therefore, on April 12, 2012, she emailed Poe requesting documents as to NJ PURE's rating. (ECF No. 145-1 ¶ 82 and ECF No. 146-4 ¶ 82.) Poe responded by providing Hobbs with "the official A.M. Best Capital Adequacy Ratio (BCAR) score and report for NJ PURE" of 183.6, which NJ PURE alleged qualified them for an A++ rating. (ECF No. 145-1 ¶¶ 82-83 and ECF No. 146-4 ¶¶ 82-83.) However, NJ PURE was not rated by A.M. Best & Company in 2012. (ECF No. 145-1 ¶ 84 and ECF No. 146-4 ¶ 84.) Once Hobbs was advised by A.M. Best & Company about the misrepresentation, NJ PURE was eliminated from consideration as carrier because she does "not deal with people who are not one hundred percent forthright and honest, and [she] would never put [her] company in that situation, so this whole conversation about financials, it didn't matter because we never got to that." (ECF No. 145-1 ¶ 87 and ECF No. 146-4 ¶ 87 (citation omitted).)

Further, Epstein stated it choose not to use NJ PURE in 2012 because it would lose a capital contribution of at least $150,000 it made to its carrier. (ECF No. 145-1 ¶ 91 and ECF No. 146-4 ¶ 91.) In fact, NJ PURE's sales notes for PAA establish that PAA's capital contribution to its carrier was "the determining factor" in PAA remaining with its carrier and not choosing NJ PURE. (ECF No. 145-1 ¶ 92 and ECF No. 146-4 ¶ 92 (citation omitted).)

NJ PURE has no evidence contradicting or calling into question the above testimony from URG and PAA or the documents that corroborate it. In fact, neither of the four NJ PURE representatives deposed in the matter Poe, Dr. Chang, Kochnover, and Quaintance could identify a specific potential insured that did not purchase NJ PURE insurance because of the Princeton Marketplace Update. (ECF No. 145-1 ¶¶ 63-72 and ECF No. 146-4 ¶¶ 63-72.) Moreover, NJ PURE's sales notes for PAA establish that PAA's capital contribution to its carrier was "the

determining factor" in PAA remaining with its carrier and not choosing NJ PURE. (ECF No. 145-1 ¶ 92 and ECF No. 146-4 ¶ 92 (citation omitted).)

As such, there is no evidence that anyone ever even read a Princeton Marketplace Update, let alone relied on anything false or misleading therein. More importantly, there is no evidence the Princeton Marketplace Updates influenced a single purchasing decision. NJ PURE's unsupported allegation that "there's probably thousands of physicians that chose not to purchase insurance through us due to the Marketplace Update," (ECF No. 146-4 ¶ 63), is speculative and insufficient to create a genuine issue of material fact. *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 575, 578 (E.D. Pa. 1999), *aff'd sub nom*, *Synyn, Inc. v. Scott-Levin*, 229 F.3d 1139 (3d Cir. 2000) (finding that, because a plaintiff seeking monetary relief must show "actual damages rather than a mere tendency to be damaged," and because plaintiff failed to "even tender a witness who specifically recalls defendant maligning plaintiff, let alone one who made a business decision based upon the slide," summary judgment was appropriate).[2] Accordingly, Princeton's Motion for Summary Judgment is **GRANTED** as to the Lanham Act claim.[3]

---

[2] To the extent NJ PURE argues its asserted damages were the result of the combination of Princeton Marketplace Updates, emails and oral statements made by the Boynton Defendants, and different marketplace updated generated independently by the Boynton Defendants, such argument is immaterial. (ECF No. 146 at 13-14, 19.) First, the record unambiguously demonstrates URG and PAA did not choose NJ PURE for other reasons. Second, there is absolutely no evidence URG or PAA received any of the Princeton Marketplace Updates. Third, even if URG or PAA received the Boynton Defendants marketplace updates, Princeton and the Boynton Defendants are separate entities and were sued in separate litigations. These cases were not consolidated for trial and there is no evidence and NJ PURE makes no argument that Princeton has any responsibility for what the Boynton Defendants may have generated or said.

[3] Even applying NJ PURE's presumption of irreparable harm standard, Princeton's Motion is **GRANTED** because Princeton has clearly provided evidence rebutting that alleged presumption.

### 2. State Law Claims

Princeton argues NJ PURE's trade libel, libel, libel *per se*, and tortious interference with prospective contractual relations claims should be dismissed because they also require NJ PURE to prove "that the alleged wrongful conduct caused the damages at issue." (ECF No. 145-2 at 17.) In the alternative, Princeton contends NJ PURE's claims sound only in trade libel, not libel, and that the Princeton Marketplace Updates do not "impute fraud, deceit, dishonestly, or reprehensible conduct to NJ PURE" as required to satisfy a claim for common law libel. (*Id.* at 27.) NJ PURE does not dispute it must prove causation for all its state law claims. However, it argues that libel and trade libel claims can coexist. (ECF No. 146 at 24.) Lastly, it argues the "information disseminated in the Marketplace Updates is reasonably susceptible of a defamatory meaning." (*Id.*)

### a. Libel

"In order to establish a prima facie case of defamation (whether denominated libel or slander), a plaintiff must show that defendant communicated to a third person a false statement about plaintiff that tended to harm [the] plaintiff's reputation in the eyes of the community or to cause others to avoid plaintiff." *W.J.A. v. D.A.*, 4 A.3d 601, 604 (N.J. Super. Ct. App. Div. 2010), *aff'd and remanded*, 43 A.3d 1148 (N.J. 2012) (quoting *McLaughlin v. Rosanio*, 751 A.2d 1066, 1071 (N.J. Super. Ct. App. Div. 2000). "Another component of a statement's defamatory nature- and thus an element of a prima facie case-is that [a] plaintiff must have been harmed by the alleged defamation." *Id.* As demonstrated above under the Lanham Act discussion, it is this latter component that is at issue here. There is no evidence NJ PURE was harmed by the Princeton Marketplace Updates. Accordingly, Princeton's Motion for Summary Judgment is **GRANTED** as to the libel claim.

### b. Trade Libel

The Court now turns to NJ PURE's claim of trade libel. To establish a claim of trade libel on must prove the following elements: "1) publication; 2) with malice; 3) of false allegations concerning plaintiff's property, product or business; and 4) special damages-pecuniary harm." *Foxtons, Inc. v. Cirri Germain Realty*, No. A-6120-05T3, 2008 WL 465653, at *7 (N.J. Super. Ct. App. Div. Feb. 22, 2008). "[T]o prove such special damages requires that Plaintiffs 'allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication.'" *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (quoting *Juliano v. ITT Corp.*, 1991 WL 10023, at *6 (D.N.J. Jan. 22, 1991)). This claim fails for the same reason the libel claim fails, there is no evidence the alleged damage was caused by the Princeton Marketplace Updates. Accordingly, Princeton's Motion for Summary Judgment is **GRANTED** as to the trade libel claim.

### c. Libel *Per Se*

The Court now turns to NJ PURE's claim of libel *per se*. Libel *per se* is "a writing that is defamatory on its face, which is distinguished from a writing that is defamatory solely in light of extrinsic facts (libel per quod)." *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 302 (D.N.J. 2016) (citing *Lawrence v. Bauer Publ'g & Printing Ltd.*, 446 A.2d 469, 473 (N.J. 1982)). "A determination of whether certain language is defamatory on its face rests within the power of the trial court." *Id.* (quoting *Lawrence*, 446 A.2d at 473)). "Only when the court finds the words to be capable of both a defamatory and a nondefamatory meaning does a question of fact arise for the jury to decide." *Id.* (citation omitted). Therefore, "the critical inquiry is whether the statement in question is defamatory on its face and, therefore, actionable without further factual support; or whether the

statement requires extrinsic facts to establish its defamatory nature." *Id.* NJ PURE has not established the Princeton Marketplace Updates are defamatory on their face. In fact, as demonstrated above, the record reveals the opposite. Poe conceded "virtually every individual sentence is . . . could be construed as true" in the Princeton Market Place Updates. (ECF No. 145-6 at 716:12-717:3; ECF No. 145-1 ¶ 26; ECF No. 146-4 ¶ 26.) Dr. Chang also testified the Princeton Marketplace Updates contain "true numbers," and conceded that in his opinion the Princeton Marketplace Updates are misleading and that her opinion "could be wrong, of course." (ECF No. 145-4 at 59.) Extrinsic evidence is obviously necessary to prove the alleged falsity of the Princeton Marketplace Updates. Accordingly, Princeton's Motion for Summary Judgment is **GRANTED** as to the libel *per se* claim.

### d. Tortious Interference

Lastly, the Court turns to NJ PURE's claim of tortious interference with prospective contractual relations. Under New Jersey law, to prove tortious interference with a prospective or existing economic relationship one must prove:

> (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference.

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 771 (D.N.J. 1995) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Because this claim also requires causation, it fails because there is no evidence the alleged damage was caused by the Princeton Marketplace Updates. Accordingly, Princeton's Motion for Summary Judgment is **GRANTED** as to the tortious interference claim.

**IV.     CONCLUSION**

For the reasons set forth above, Princeton's Motion for Summary Judgment (ECF No. 145) is **GRANTED**.


**Date:** September 20, 2018                              */s/ Brian R. Martinotti*          
                                                                          **HON. BRIAN R. MARTINOTTI**
                                                                          **UNITED STATES DISTRICT JUDGE**